1  Jonathan D. Selbin  (State Bar No. 170222)
   *jselbin@lchb.com*
2  Nimish R. Desai  (State Bar No. 244953)
   *ndesai@lchb.com*
3  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
   275 Battery Street
4  San Francisco, CA 94111-3336
   Telephone:  (415) 956-1000
5  Facsimile:   (415) 956-1008

6  Elizabeth A. Alexander  (*pro hac vice*)
   *ealexander@lchb.com*
7  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
   One Nashville Place
8  150 Fourth Avenue, North, Suite 1650
   Nashville, TN  37219-2423
9  Telephone:  (615) 313-9000
   Facsimile:   (615) 313-9965

10
   *Attorneys for Attorneys for Plaintiffs and the Proposed*
11 *Class*

12 [Additional Counsel Appear on Signature Page]

13

14                  UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                      SAN JOSE DIVISION

17

18 ERIC ROSS and BRADLEY S. HURETH,        Case No. 5:09-CV-00670-JF

19              Plaintiffs,               **NOTICE OF MOTION AND MOTION FOR
                                          FINAL APPROVAL OF THE CLASS
20 v.                                      ACTION SETTLEMENT AND
                                          MEMORANDUM OF POINTS AND
21 TREX COMPANY, INC., a Delaware          AUTHORITIES IN SUPPORT THEREOF**
   corporation,
22                                         DATE:          October 30, 2009
              Defendant.                   TIME:          9:00 a.m.
23                                         COURTROOM:  3, 5th Floor
                                          JUDGE:         Hon. Jeremy Fogel
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 2

II.  STATEMENT OF THE FACTS .......................................................................... 4

    A.  Factual Background ................................................................................... 4

    B.  Procedural History .................................................................................... 5

    C.  Plaintiffs Thoroughly Investigated The Case............................................ 5

    D.  Settlement Negotiations ............................................................................ 7

    E.  Preliminary Approval................................................................................ 8

III.  THE PROPOSED SETTLEMENT.................................................................... 10

    A.  The Settlement Class................................................................................ 10

    B.  The Settlement Benefits .......................................................................... 11

    C.  Attorneys' Fees and Costs....................................................................... 12

    D.  Class Representative Stipend .................................................................. 12

    E.  Settlement Administration And Notice.................................................... 12

    F.  Requests For Exclusion From And Objections To The Settlement .......... 12

IV.  THE CLASS ACTION SETTLEMENT PROCESS ........................................... 13

V.  THE COURT-ORDERED NOTICE PROGRAM IS
    CONSTITUTIONALLY SOUND AND HAS BEEN FULLY
    IMPLEMENTED ............................................................................................... 13

    A.  Notice Standards ..................................................................................... 13

    B.  The Notice Program Has Been Fully Implemented And Meets
    Applicable Standards ............................................................................... 14

VI.  FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE.................... 15

    A.  The Settlement Is Presumed To Be Fair, Adequate, And Reasonable...... 16

    B.  All Of The Relevant Factors Support Final Approval Of The
    Settlement................................................................................................ 17

        1.  The Value of the Settlement, and the Substantial Benefits it
        Provides to Class Members, Support Final Approval.................... 17

        2.  The Risks Inherent in Continued Litigation Support Final
        Approval....................................................................................... 18

        3.  The Discovery and Investigation Completed Before
        Settlement Favor Final Approval.................................................. 19

        4.  The Terms and Conditions of the Proposed Settlement
        Favor Final Approval................................................................... 19

        5.  The Recommendation of Experienced Class Counsel
        Supports Final Approval .............................................................. 19

        6.  The Expense and Likely Duration of Litigation in the
        Absence of a Settlement Supports Final Approval ....................... 21

**TABLE OF CONTENTS**
(continued)

Page

7.    The Presence of Good Faith and the Absence of Collusion
      Favors Final Approval ................................................................ 21

8.    Class Members' Positive Reaction Supports Final Approval ....... 22

VII.   THE COURT CAN APPROPRIATELY ENTER A FINAL ORDER ON
       BEHALF OF THE CLASS .................................................................... 24

VIII.  CONCLUSION ................................................................................ 24

MPA ISO PLTFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT

# TABLE OF AUTHORITIES

**Page**

## CASES

*Boyd v. Bechtel Corp.,*
485 F.Supp. 610 (N.D. Cal. 1979) ............................................................................ 20

*Churchill Vill., L.L.C. v. GE,*
361 F.3d 566 (9th Cir. 2004) ......................................................................... 16, 21, 22

*Class Plaintiffs v. City of Seattle,*
955 F.2d 1268 (9th Cir. 1992) ......................................................................... passim

*Ellis v. Naval Air Rework Facility,*
87 F.R.D. 15 (N.D. Cal. 1980) .................................................................................. 16

*Ficalora v. Lockheed Cal. Co.,*
751 F.2d 995 (9th Cir. 1985) .................................................................................... 16

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998) ..................................................................... 17, 18, 19, 21

*In re Consolidated Pinnacle West Securities,*
51 F.3d 194 (9th Cir. 1995) ...................................................................................... 22

*In re Mego Fin. Corp. Securities Litig.,*
213 F.3d 454 (9th Cir. 2000) .................................................................................... 19

*Linney v. Cellular Alaska P'ship,*
151 F.3d 1234 (9th Cir. 1998) .................................................................................. 23

*Marshall v. Holiday Magic, Inc.,*
550 F.2d 1173 (9th Cir. 1977) ............................................................................. 22, 23

*Officers for Justice v. Civil Serv. Comm'n,*
688 F.2d 615 (9th Cir. 1982) .................................................................... 15, 16, 21, 23

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999) ................................................................................................. 22

*Pelletz v. Weyerhaeuser Co.,*
255 F.R.D. 537 (W.D. Wash. 2009) ..................................................................... 20, 21

*Pelletz v. Weyerhaeuser Co.,*
No. 08-0334, 2009 U.S. Dist. LEXIS 1803
(W.D. Wash. Jan. 9, 2009) ........................................................................................ 21

*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797 (1985) ............................................................................................ 13, 14

*Zaremba v. Marvin Lumber and Cedar Co.,*
458 F. Supp. 2d 545 (N.D.Ohio 2006) ................................................................... 9, 24

**TABLE OF AUTHORITIES**
(continued)

Page

**RULES**

Fed. Rule Civ. P.
   23(e)(l)(B) ................................................................................................................. 13

**TREATISES**

Alba Conte & Herbert B. Newberg,
   *Newberg on Class Actions* (4th ed. 2002)
     § 11.41 ............................................................................................................ 13, 16
     § 11.43 ................................................................................................................. 21

*Manual for Complex Litigation (Fourth)*
     § 21.311 ............................................................................................................... 14
     § 21.312 ............................................................................................................... 14
     §§ 21.632-34 n.971 ............................................................................................. 13
     § 30.42 ................................................................................................................. 16
     n.882 ................................................................................................................... 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- iv -

1    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2         NOTICE IS HEREBY GIVEN that on October 30, 2009, at 9:00 a.m., or as soon

3    thereafter as the matter may be heard, in the Courtroom of the Honorable Jeremy Fogel of the

4    Northern District of California, San Jose Division, located at 280 South First Street, San Jose, CA

5    95113-3099, Plaintiffs Eric Ross and Bradley S. Hureth ("Plaintiffs"), on behalf of themselves

6    and all others similarly situated, by and through their undersigned counsel, will and hereby do

7    request that this Court enter an Order Granting Final Approval of the Settlement.

8         This Motion is supported by Plaintiffs' accompanying Memorandum of Points and

9    Authorities, the supporting papers and exhibits filed herewith, the record in this case, and any oral

10   argument the Court allows.

11        Defendant Trex Company, Inc. does not object to the motion in the context of the parties'

12   proposed settlement.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      **INTRODUCTION**

Plaintiffs respectfully request that this Court grant final approval of the proposed Settlement Agreement, submitted previously with Plaintiffs' motion for preliminary approval. (Docket No. 32, Ex. A; *see* amended Agreement at Docket No. 78, Ex. A.)  The Settlement resolves all claims in this matter against Defendant Trex Company, Inc.

Plaintiffs Eric Ross and Bradley S. Hureth brought this action on behalf of themselves and all others similarly situated alleging a defect in the design and manufacture of Trex decking and railing products ("Trex Products").  Specifically, Plaintiffs allege that Trex Products are inherently defective in that they experience "Surface Flaking" shortly after being installed and well before the expiration of their warranted life, regardless of whether the product is properly installed and maintained.  The Settlement resolves all claims in this matter against Defendant Trex Company, Inc. regarding "Surface Flaking."  Surface Flaking, as defined by the Settlement Agreement, means "any visibly noticeable surface flaking, crumbling, delamination, and/or peeling away of the surface of Trex Product caused by a design or manufacturing defect." (Docket No. 78, Ex. A, § A, ¶ 31.)

Starting in May 2007, when Plaintiffs counsel first began to investigate this problem, the parties engaged in an extensive investigation and expert evaluation of Plaintiffs' claims.  Through informal discovery the parties exchanged pertinent information that would have been available under usual discovery procedures.  This information included product formulation, expert reports, warranty, and claims information.  Deck inspections and testing of Trex Product were also conducted.

Meaningful settlement discussions occurred from June 2008 through February 9, 2009, when the parties entered into a Memorandum of Understanding ("MOU") on the material terms of the Settlement, except for attorneys' fees and costs. The discussions culminated in the Settlement Agreement entered on April 6, 2009.

1  As described below, the Settlement endeavors to provide relief to Class Members who

2  have experienced Surface Flaking, including relief not available under the warranty.[1]

3  Specifically, the Settlement ensures that those who submit valid claims will receive replacement

4  product or a cash equivalent at retail price for any defective Trex Product (i.e., Trex Product

5  exhibiting the Surface Flaking defect).  For those with more than 50% of the Trex decking boards

6  exhibiting the Surface Flaking defect, Trex will replace all of the Trex decking boards or provide

7  a cash equivalent at retail price.  This enhanced replacement/reimbursement scheme is not

8  available under the warranty.  The Settlement also goes beyond the warranty terms by providing

9  for a partial labor stipend as well as free shipping for all replacement product.  Finally, the

10  Settlement establishes an enforcement scheme to ensure Trex complies with its terms by

11  implementing a neutral appeals process for any denied claims.  Equally important, it avoids the

12  cost and risks of ongoing litigation, including the potential to lose claims, damages types, and

13  even portions of the Settlement Class.

14  The proposed Settlement is informed by extensive investigation, expert evaluation of

15  affected decks and product samples to assess the scope of the alleged defect, input from affected

16  Class Members, over a thousand pages of pertinent information obtained from Trex without the

17  need for time-consuming and costly discovery procedures, over nine months of sustained and

18  contentious negotiations, and finally by counsels' experience in other composite decking class

19  action cases.  After assessing this information, and based on their extensive collective experience,

20  the undersigned counsel all reached the same conclusion – that the proposed Settlement conferred

21  immediate and substantial benefits on the class, and that the risks and disadvantages of litigating

22

23  [1] As the Court has noted, Trex's twenty-five year warranty on all its product, including
that at issue, limits recovery as follows: "The warranty shall not cover and Trex shall not be
responsible for costs and expenses incurred with respect to the removal of defective Trex

24  products or the installation of replacement materials, including but not limited to labor or freight."
The warranty further states: "UNDER NO CIRCUMSTANCES WILL TREX BE LIABLE FOR

25  SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES… AND TREX'S LIABILITY
WITH RESPECT TO DEFECTIVE PRODUCTS SHALL IN NO EVENT EXCEED THE

26  REPLACEMENT OF SUCH PRODUCTS OR REFUND OF THE PURCHASE PRICE."

27  (Docket No. 60, Ex. A.)

28

1   further in the hopes of recovering additional labor costs outweighed the potential benefits.  As the

2   Court found in its Order granting preliminary approval, the benefits provided "represent value

3   gained through the Settlement."  (Docket No. 81 at 7.)

4          With this Motion, Plaintiffs seek final approval of the Settlement Agreement.  As

5   discussed in detail below, the proposed Settlement satisfies all criteria for final settlement

6   approval under Ninth Circuit law.  Trex does not oppose this Motion in the context of this

7   Settlement.

8   **II.    STATEMENT OF THE FACTS**

9          **A.    Factual Background**

10          Plaintiffs brought this action against Trex as a consumer protection and breach of

11   warranty class action on behalf of a proposed California and Nationwide Class.  Plaintiffs allege

12   that Trex Product is defective in that it begins to exhibit Surface Flaking well before the end of its

13   warranted life.  Further, Plaintiffs allege that the Surface Flaking occurs regardless of whether the

14   Trex Product is properly installed and maintained, and is thus a defect inherent in the Trex

15   Product.

16          Unlike traditional wood decking, Trex Product is a plastic and wood composite and is

17   specifically marketed to be more durable than traditional wood in outdoor conditions without

18   additional treatment.  Based on the nature of the Trex Product's deterioration, the reports of

19   Surface Flaking occurring in varying climates, and the fact that Surface Flaking can occur even

20   when the Trex Product is properly installed and maintained, Plaintiffs allege that the failure of the

21   Trex Product is due to an inherent defect.  Plaintiffs have retained a wood science expert who

22   confirmed the Surface Flaking defect.  Moreover, Trex  acknowledged the existence of a Surface

23   Flaking defect in certain Trex Product manufactured in its Fernley, Nevada plant in its 2007

24   annual report.

25          As a result of Trex's conduct, Plaintiffs allege that thousands of homeowners in California

26   and nationwide, including the class representatives, own defective Trex Product.  The class has

27   suffered ascertainable losses including not only the cost of the Trex Product, but also

28   unanticipated labor expenses to replace the Trex Product.

Both Plaintiffs and Trex are ably represented by counsel who are extremely experienced in consumer class action litigation.  Their investigation was thorough and the settlement negotiations were hard-fought and conducted at arms'-length over a period of nine months, from June 2008 through February 9, 2009.  Plaintiffs' counsel zealously sought the appropriate compensation for Plaintiffs and the class in an effort to avoid the protracted timetable and uncertainties of litigation.

**B.    Procedural History**

The Complaint was filed in the Superior Court of California, County of Santa Cruz on September 30, 2008 alleging claims related to mold spotting and Surface Flaking.  (Declaration of Jonathan D. Selbin in Support of Plaintiffs' Motion for Final Settlement Approval ("Selbin Decl."), at ¶ 8.)  The Complaint was amended on January 6, 2009.  Plaintiffs amended the Complaint to temporarily remove the mold claims since this Settlement only resolves the Surface Flaking claims.  (*Id.*)  The case was removed to this Court on February 13, 2009. (*Id.*)  The parties signed an MOU on February 9, 2009, outlining the terms of the Settlement other than attorneys' fees and costs.  (*Id.* at ¶ 20.)  The proposed Settlement Agreement resolves all claims related to Surface Flaking that were asserted in the above-captioned case on behalf of the proposed California Class and the proposed Nationwide Class, who collectively include all owners of Trex Product in the United States manufactured at the Fernley, Nevada plant between January 1, 2002 and December 31, 2007.

**C.    Plaintiffs Thoroughly Investigated The Case**

Counsel for Plaintiffs began investigating complaints related to Trex decking in July 2007 after they were contacted by a homeowner whose Trex Product was allegedly defective.  (Selbin Decl., at ¶ 9.)  After further investigation, in May 2008, Plaintiffs' counsel contacted Trex by letter regarding the mold and Surface Flaking issues.  (*Id.* at ¶ 10.)  On June 9, 2008, Plaintiffs' counsel met with Trex representatives in person in Washington, D.C. to exchange pertinent information regarding the alleged mold defect and the alleged Surface Flaking defect.  (*Id.*)  At that time, they agreed to continue exchanging information and working cooperatively toward a resolution of both claims.  (*Id.*)  Counsel for Plaintiffs proposed, and Trex agreed to, a tolling

1   agreement which obviated the need for filing a Complaint, and preserved class members' rights

2   during the pendency of the settlement discussions.  (*Id*.)

3        A related case, *Okano v. Trex Company, Inc.*, Case No. 3:09-cv-0187-WHA, alleging the

4   Surface Flaking and mold defects was transferred on April 14, 2009, from the United States

5   District Court, Western District of Washington, to the Northern District of California, San

6   Francisco Division and was subsequently reassigned to this Court by a Related Case Order.

7   (Docket No. 30.)

8        Before the settlement discussions began, and during the entire course of the discussions,

9   Plaintiffs' counsel expended significant time, effort and resources developing their case regarding

10   both mold spotting and Surface Flaking.  (Selbin Decl., at ¶ 11.)  Plaintiffs' expert conducted

11   multiple deck inspections with Trex's research and development employees in attendance.  In

12   addition to substantial testing regarding the nature and cause of mold spotting, experts retained by

13   Plaintiffs' counsel conducted bulk sampling of Trex Product that exhibited Surface Flaking to

14   determine the nature and cause of the alleged Surface Flaking defect.  (*Id.* at ¶ 11.)  Plaintiffs also

15   discussed these issues with a leading wood-plastic composite materials expert.  (Declaration of

16   Richard S. Lewis, Docket No. 35 at ¶ 8.)  At another in-person meeting of counsel for the parties

17   on August 22, 2008, Plaintiffs' wood science expert met with Trex's research and development

18   staff, at which time they exchanged significant technical information.  (Selbin Decl. at ¶ 12.)

19        In addition to retaining and utilizing two experts during the informal discovery process,

20   Plaintiffs obtained a great deal of proprietary information from Trex.  Over one thousand pages of

21   documents were obtained from Trex, including product formula information, laboratory testing

22   results, studies conducted by Trex regarding both the alleged mold spotting and alleged Surface

23   Flaking, Trex's research and development information, marketing materials, internal documents

24   regarding complaints and warranty claims related to both mold spotting and Surface Flaking, and

25   insurance information.  (Selbin Decl., at ¶ 13.)  This information was instrumental in informing

26   Plaintiffs' counsel of the strengths and weaknesses of the Surface Flaking claims.  (*Id*.)

27        Also, as part of their investigation, Plaintiffs' counsel has been in contact with

28   approximately 450 owners of Trex Product, a large percentage of whom have complained of

1    Surface Flaking, and who provided information regarding their experience with Trex Product.

2    (Selbin Decl., ¶ 14.)

3        All the information obtained from Trex, Plaintiffs' experts, and Class Members was used

4    in the calculation of damages and in the formulation of the MOU and Settlement Agreement.

5        **D.    <u>Settlement Negotiations</u>**

6        The settlement negotiations in this case were intense, substantive, and adversarial.  (Selbin

7    Decl., ¶ 18.)  They involved attorneys on both sides who are experienced in the prosecution,

8    defense, trial, and settlement of class action litigation, including allegedly defective products and

9    consumer fraud cases.  (*Id*. at ¶¶ 2-7.)  As a result of the work discussed above and based on their

10   experience, the attorneys were well-versed in the factual and legal issues implicated in this action.

11   (*Id*.)

12       From June 2008 through February 2009, counsel for the parties engaged in a sustained and

13   contentious, arm's-length negotiation process.  (Selbin Decl., ¶¶ 8-20.)  In addition to the in-

14   person meetings in June and August 2008, counsel and Trex representatives met in person for

15   additional arm's-length negotiations on or about September 27 and November 7, 2008 in

16   Washington, D.C., on or about November 20, 2008, in Newark, New Jersey, and again in

17   Washington, D.C. on December 17, 2008.  (*Id*. at ¶ 16.)  Significant discussions continued by

18   telephone and email during the entire course of the settlement negotiations.  (*Id*. at ¶ 17.)  The

19   negotiations between Trex and Class Counsel were arm's-length and hard-fought at all times.  (*Id*.

20   at ¶ 18.)  There were material disputes regarding, among other things, the scope of the alleged

21   defect, the extent of the damages, and the coverage provided by Trex's warranty.  (*Id*.)  On each

22   of these points, the parties had significant disagreement.  (*Id*.)  As a result, on several instances,

23   the parties came to an impasse and it appeared that a settlement could not be reached without

24   resorting to litigation.  (*Id*.)  On one occasion, in fact, at least one attorney representing Plaintiffs

25   walked out of a settlement meeting over such a dispute.  (*Id*.)

26       Because of these periodic breakdowns, Plaintiffs filed their Complaint in Santa Cruz

27   Superior Court, California on September 30, 2008.  (Selbin Decl., ¶ 18.)  Despite the filing of the

28   Complaint, the parties continued to work toward a settlement.  (*Id*. at ¶ 19.)  At the November 20,

1   2008, meeting, it became apparent that the only claim that Trex would agree to resolve through

2   settlement was the Surface Flaking claim.  (*Id.*)

3       The extensive negotiations between Plaintiffs' counsel and Trex finally culminated in an

4   agreement in principle on all material terms of a nationwide Surface Flaking Settlement (with the

5   exception of attorneys' fees and costs) on or about January 28, 2009.  An MOU setting forth those

6   terms was finalized on February 5, 2009.  (Selbin Decl. ¶ 20.)  Agreement on all material

7   Settlement terms was reached before the parties negotiated recovery of Class Counsels' attorneys'

8   fees and costs.  (*Id.*)   On April 6, 2009, the parties finalized the Settlement Agreement.  (*Id.*)

9       **E.      Preliminary Approval**

10      On May 26, 2009, Plaintiffs submitted a Motion for Preliminary Approval of the

11  Settlement.  (Docket No. 31.)  Plaintiffs asked the Court to grant preliminary approval of the

12  proposed Settlement; to provisionally certify the proposed nationwide Settlement Class; to

13  appoint Eric Ross and Bradley Hureth as class representatives; to approve the Notice Program

14  and forms of Settlement notice and order provision of such notice; to appoint the firms of Lieff,

15  Cabraser, Heimann & Bernstein, LLP, Tousley Brain Stephens, PLLC, Audet & Partners, LLP,

16  Cuneo, Gilbert & LaDuca, LLP and Lockridge, Grindal Nauen P.L.L.P as Class Counsel; and to

17  schedule a final fairness hearing.  (*See* Docket No. 31.)

18      *Okano* Plaintiffs objected to preliminary approval of the Settlement on June 17, 2009

19  (Docket No. 49.)  The chief objection was that the proposed recovery is insufficient because it

20  does not provide for recovery of full labor costs.

21      *Okano* Plaintiffs also argued that the release would encompass claims related to a failure

22  of structural integrity of the Trex Product, thus precluding Class Members from participating in a

23  prior settlement with Trex in the case of *Kanefsky v. Trex Company, Inc.*, No. L-7347-00 (N.J.

24  Sup. Ct., Essex County).  That settlement required successful claimants to show that there is a

25  compromise of structural integrity, degradation of more than one-quarter inch, or "aluminum

26  flakes greater than 1/8 inch."  (*See* Declaration of Robert F. Lopez, Docket No. 51, Ex. D at 2; *see

27  also* <trex.com/legal/classactin.asp>.)  During the course of their extensive investigation,

28  Plaintiffs concluded that the alleged Surface Flaking defect was not one that compromised the

structure of the Trex boards.  (Selbin Decl., ¶ 15.)  Nevertheless, on July 15, 2009, in response to *Okano*'s concern and at the suggestion of the Court, the Plaintiffs filed an amended Settlement Agreement excluding from the release any claims in which "a single piece of Trex Product is broken completely through from top to bottom into two or more separate pieces."  (Notice of Filing of Revised Settlement Agreement, Class Notice and Proposed Order, Ex. A at p. 8.)  To ensure that there is no legitimate concern regarding structural integrity resulting from the alleged Surface Flaking defect, Plaintiffs have since asked their wood science expert, Albert L. DeBonis, PhD, to test a sample of Plaintiff Ross's deck to confirm that the alleged defect does not compromise the structural integrity of the boards.  Dr. DeBonis did confirm this to be true, and a report setting forth the scope of his analysis and its conclusions is attached to the Selbin Declaration filed herewith as Exhibit B.  *Okano* Plaintiffs also raised concerns regarding the fees, costs and service payments to the named plaintiffs.  Those concerns were addressed by the Court in its Order, and will be addressed again by the Plaintiffs in their Memorandum in Support of Final Approval of Attorneys' Fees, Costs, and Service Payments.

A hearing was held on the Plaintiffs' Motion for Preliminary Settlement Approval on July 10, 2009.  The Court carefully considered each issue raised by *Okano* Plaintiffs and on July 30, 2009, granted preliminary settlement approval.  In considering *Okano's* concern regarding the value of the Settlement, the Court noted that "a settlement by definition requires compromise, and Plaintiffs cannot expect to make a full recovery in the absence of litigation." (Docket No. 81 at 7.)  The Court further held that the "labor costs, shipping, and additional recovery for more than fifty percent failure exceed the basic entitlement of the warranty and represent value gained through the Settlement."  (*Id.*)  The Court found, in addressing *Okano's* concerns, that there was no guarantee that the warranty exclusion for labor costs would be overturned through litigation and cited authority for the contrary. Specifically, the Court stated that, "While it is possible that the disclaimer would be found unenforceable for unconsionability, such a result cannot be presumed.  Limitations of consequential economic damages for consumers are not prima facie unconscionable, U.C.C. § 2-719(3), and such disclaimers in consumer warranties have been upheld where there is no great disparity of bargaining power.  *E.g.*

1  *Zaremba v. Marvin Lumber and Cedar Co.*, 458 F. Supp. 2d 545 (N.D.Ohio 2006)."

2  Accordingly, the Court rejected *Okano* Plaintiffs' objections and set a hearing for final Settlement

3  approval on October 30, 2009.  (*Id.* at 10.)

4  **III.    THE PROPOSED SETTLEMENT**

5        As the Court determined at the preliminary approval stage, the proposed Settlement offers

6  substantial recovery for Class Members, including certain recovery and benefits not provided for

7  in Trex's warranty.  It does so through a neutral claims process that imposes little burden on, and

8  no cost to, Class Members.  The Settlement treats all Class Members fairly and equally as both

9  the amount of replacement product and the labor payment each Class Member receives are

10  proportionate to the harm he or she has suffered.  Importantly, the Settlement avoids the

11  substantial risk, delay, and expense of continued litigation.

12        Class Counsel are all extremely experienced in class action litigation (including class

13  action litigation regarding allegedly defective composite decking) as well as settlement and

14  claims resolution processes, and are convinced that the proposed Settlement is fair and highly

15  beneficial to the class.  (Declarations of Selbin ¶ 36; Stephens ¶ 13; Gary ¶ 12; Shelquist ¶ 10;

16  Lewis ¶ 15; Miller ¶ 13; McShane ¶ 10.)

17        **A.    The Settlement Class**

18        The "Settlement Class" includes all Persons in the United States or its Territories who

19  own or owned decks or other structures composed of Trex Product manufactured at Trex's

20  Fernley, Nevada plant between January 1, 2002 and December 31, 2007.  (Docket No. 78, Ex. A,

21  § A, ¶ 30.)  Included within the Settlement Class are the legal representatives, heirs, successors in

22  interest, transferees, and assignees of all such foregoing holders and/or owners, immediate and

23  remote.  (*Id.*)  Excluded from the Settlement Class are:  "Defendant and its subsidiaries and

24  affiliates; all Persons who, in accordance with the terms of the Agreement, properly execute and

25  timely file during the Opt-Out Period a request for exclusion from the Settlement Class; all

26  governmental entities; and the judge(s) to whom this case is assigned and any immediate family

27  members thereof."  (*Id.*)

28

### B.     The Settlement Benefits

As set forth in detail in the Memorandum in Support of Plaintiffs' Motion for Preliminary Settlement Approval, upon proof of a valid claim for Surface Flaking, Class Members will be provided with either replacement product or a cash equivalent at retail price for any board of Trex Product experiencing Surface Flaking, either in whole or in part. (Docket No. 78, Ex. A, § D, ¶ 1(a).)  The decision whether to provide replacement or cash will be at Trex's discretion and any replacement product provided will carry the same limited warranty as the originally installed Trex Product. (*Id.*)

Further, if a Class Member has experienced Surface Flaking in more than 50% of the Trex decking boards, Trex will replace all of the Trex decking boards or provide a cash equivalent at retail price. (Docket No. 78, Ex. A, § D, ¶ 1(a).)  This benefit is not provided for in Trex's warranty.  Shipping of any replacement material will be paid for by Trex. (*Id.*)  This benefit is expressly excluded by Trex's warranty.

In addition to the cash payment or replacement, Class Members will be entitled to a payment for partial labor costs associated with replacement. (Docket No. 78, Ex. A, § D, ¶ 1(b).)  This benefit will be provided whether Class members actually replace the product or not.  Class Members who have not previously received any form of compensation from Trex will receive a labor payment determined by a formula of $0.18 per linear foot of Trex Product board to be replaced. (*Id.*)  This calculation endeavors to achieve a payment of $225.00 to a Class Member with an average sized deck based on a typical order for the Trex Product. (*Id.*)  Class Members who have already received some form of compensation (*e.g.*, through an earlier claim on their warranty outside the Class Settlement claims process) will receive a labor payment calculated by the same formula of $0.18 per linear foot of Trex Product board to a maximum of $225.00. (*Id.* at § D, ¶ 1(c).)  Labor costs are specifically excluded from the Trex warranty.

Finally, Class Members will have access to a neutral appeal process for any claim denied under the Settlement and will have the benefit of experienced Class Counsel monitoring the progress of the Settlement through the reporting requirements it provides. (Docket No. 78, Ex. A at § D, ¶ 1(c).)

### C.  **Attorneys' Fees and Costs**

Attorneys' fees and costs for Class Counsel, a total amount of $1.25 million subject to approval by the Court, will be paid separately by Trex in addition to any relief granted to Plaintiffs and Settlement Class members.  (Docket No. 78, Ex. A, § K, ¶ 1.)  The payment for fees and costs will in no way reduce any Class Member's recovery.  Class Counsel and counsel for Trex negotiated fees and costs separately from the negotiations for settlement and only after all other material terms were reached.  (Selbin Decl., ¶ 21.)  The enforceability of the Settlement Agreement is not contingent on the amount of attorneys' fees or costs awarded.  (*Id.*)

### D.  **Class Representative Stipend**

Trex will provide each named Plaintiff or class representative (*i.e.*, Eric Ross and Bradley S. Hureth) with a cash payment of $7,500.  (Docket No. 78, Ex. A, § Q, ¶ 3(i).)  This amount shall be in addition to the relief to which they are entitled under this Agreement.  (*Id.*)

### E.  **Settlement Administration And Notice**

The costs of notice (including but not limited to the costs of printing, reproducing, and publishing notice to the potential Settlement Class members) and claims administration have been paid for by Trex.  (Docket No. 78, Ex. A, § F, ¶ 1.)  As set forth in greater detail below, Notice has been effectuated in accordance with the Notice Plan, with both Direct Mail Notice and Publication Notice.  Subject to Court approval, Trex will continue to administer the claims resolution process, subject to review by Class Counsel, including calculating and issuing settlement payments and responding to Class Member inquiries regarding the claims administration process.  The Notice Plan provided the best practicable notice to Class Members.

### F.  **Requests For Exclusion From And Objections To The Settlement**

The Notice informed Class Members of their rights to opt-out of the proposed Settlement and to object to the terms of the Settlement - including the request for attorneys' fees and costs, and Class representative service awards.  The deadline for objections is October 9, 2009.  As of this filing, only two objections had been submitted.  (*Id.*)

The deadline for exclusions is October 29, 2009. (Selbin Decl., ¶ 26.j.)  As of this filing, only thirty-six (36) Class Members had excluded themselves from the Settlement.  (*Id.*)  Any

1    Class Member who timely opts out will not be bound by the Settlement and will be free to

2    separately pursue claims, if any, against Trex.

3    **IV.    THE CLASS ACTION SETTLEMENT PROCESS**

4            As a matter of "express public policy," federal courts strongly favor and encourage

5    settlements, particularly in class actions and other complex matters, where the inherent costs,

6    delays, and risks of continued litigation might otherwise overwhelm any potential benefit the

7    class could hope to obtain. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir.

8    1992) (noting that "strong judicial policy . . . favors settlements, particularly where complex class

9    action litigation is concerned"); *see also* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class*

10   *Actions* § 11.41 (4th ed. 2002) ("*Newberg")* (gathering cases). The proposed Settlement is the

11   best vehicle for Class Members to receive the relief to which they are entitled in a prompt,

12   efficient manner.

13           Class action settlement approval is a three-step process. *See Manual for Complex*

14   *Litigation* (*Fourth*) ("*Manual for Compl. Lit.*") §§ 21.632-34 n.971 (2004). Two of the three

15   steps have already been completed here. First, in granting preliminary approval on July 30, 2009,

16   the Court conducted a preliminary evaluation of the Settlement and determined it to be within the

17   range of reasonableness. The Court also provisionally certified the class and determined that the

18   proposed Notice Program was appropriate.

19           The second step was the implementation of the Notice Program. As discussed below, the

20   Notice has been sent to Class Members, published in accordance with the Notice Plan, and

21   provided to the appropriate state and federal government officials pursuant to 28 U.S.C. § 1715.

22   The third step is the final approval hearing and final approval of the Settlement—the issue now

23   before the Court.

24   **V.    THE COURT-ORDERED NOTICE PROGRAM IS CONSTITUTIONALLY**
     **SOUND AND HAS BEEN FULLY IMPLEMENTED**
25

     **A.    Notice Standards**
26

27           To protect the rights of absent Class Members, the Court must provide the best notice

28   practicable to Class Members of a potential class settlement. *See* Fed. Rule Civ. P. 23(e)(l)(B);

833601.4                                     - 13 -                      CASE NO. 5:09-CV-00670-JF

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).  As the *Manual for Complex Litigation* observes, "Rule 23 . . . requires that individual notice in [opt-out] actions be given to class members who can be identified through reasonable efforts.  Those who cannot be readily identified must be given the 'best notice practicable under the circumstances." *Id.* at § 21.311.  "[D]ue process has not required actual notice to parties who cannot reasonably be identified." *Id.* at n.882.

**B.**      **The Notice Program Has Been Fully Implemented And Meets Applicable Standards**

"Rule 23(e)(l)(B) requires the court to 'direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise' regardless of whether the class was certified under Rule 23(b)(l), (b)(2), or (b)(3)." *Manual for Compl. Lit.*, *supra*, at § 21.312.  Many of the same considerations govern both certification and settlement notices.  In order to protect the rights of absent class members, the Court must provide the best notice practicable to class members.  *See Phillips Petroleum*, 472 U.S. at 811-12.  According to the *Manual*, *supra*, at § 21.312, the settlement notice should:

- Define the class;

- Describe clearly the options open to the class members and the deadlines for taking action;

- Describe the essential terms of the proposed settlement;

- Disclose any special benefits provided to the class representatives;

- Provide information regarding attorneys' fees;

- Indicate the time and place of the hearing to consider approval of the settlement, and the method for objecting to or opting out of the settlement;

- Explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set out those variations;

- Provide information that will enable class members to calculate or at least estimate their individual recoveries; and

- Prominently display the address and phone number of class counsel and the

1    procedure for making inquiries.

2    The Court-approved Notice Plan satisfied all of the criteria identified above and has now

3    been fully implemented.  (Declaration of Patrick J. Perrone ("Perrone Decl.").)  First, individual

4    notice was sent to over 17,000 unique names and addresses via U.S. Mail.  (*Id.*, ¶ 4.)  The mailing

5    list was generated by Trex from its database of inquiries received regarding the alleged defect.

6    Prior to mailing, the addresses were checked against the National Change of Address ("NCOA")

7    database maintained by the United States Postal Service ("USPS").  (*Id.*)

8    In addition, the Court-approved publication notice ran in *USA Today* on August 18, 2009,

9    which has a reported circulation of 2,284,219, and in *TV Guide* on August 24-September 6, 2009,

10   which had a reported circulation of 2,900,000.  (Perrone Decl., ¶ 6.)  On July 31, 2009, Trex

11   issued a press release.  (*Id.*, ¶ 6.)  Trex's settlement website

12   (<http://www.Trex.com/legal/classactionsettlement.aspx>) went online by August 6, 2009 with

13   links to the website posted on http://www.trex.com.  (*Id.*, ¶ 8.)  By logging onto this website,

14   Class members can view and print the Settlement Agreement, the Class Notice, and the claim

15   forms.  (*Id.*)  The website also provides the toll free number for settlement inquiries.  (*Id.*)

16   Finally, notice of the settlement was provided to the appropriate state and federal government

17   officials pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715.  (*Id.*, ¶ 10.)

18   **VI.     FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE**

19   The Ninth Circuit has recognized a strong policy favoring voluntary settlement of

20   complex class actions. "[V]oluntary conciliation and settlement are the preferred means of dispute

21   resolution."  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). "This

22   is especially true in complex class action litigation," which lend themselves to compromise

23   because of the difficulties of proof, uncertainty of outcome, and length and complexity of

24   litigation.  *Id.; see also City of Seattle*, 955 F.2d at 1276 ("strong judicial policy ... favors

25   settlements, particularly where complex class action litigation is concerned").

26   Federal Rule of Civil Procedure 23(e) requires that a class action settlement be "fair,

27   adequate and reasonable" in order to merit approval.  A settlement is fair, adequate, and

28   reasonable when "the interests of the class as a whole are better served if the litigation is resolved

1  by the settlement rather than pursued." *Manual for Compl. Lit*. at § 30.42.  The decision to

2  approve or reject a proposed settlement is committed to the court's sound discretion.  *City of*

3  *Seattle*, 955 F.2d at 1276.

4    In affirming the settlement approved by the trial court in *City of Seattle*, the Ninth Circuit

5  noted that it "need not reach any ultimate conclusions on the contested issues of fact and law

6  which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and

7  avoidance of wasteful and expensive litigation that induce consensual settlements." *City of*

8  *Seattle*, 955 F.2d at 1291 (internal quotation and citation omitted).  The district court's ultimate

9  determination "will involve a balancing of several factors," which may include:

10     the strength of plaintiffs' case; the risk, expense, complexity, and
    likely duration of further litigation; the risk of maintaining class
11     action status throughout the trial; the amount offered in settlement;
    the extent of discovery completed, and the stage of the proceedings;
12     the experience and views of counsel . . .  and the reaction of the
    class members to the proposed settlement.
13

14  *Id.* (quoting *Officers for Justice*, 688 F.2d at 625).  *See also Churchill Vill., L.L.C. v. GE*, 361

15  F.3d 566, 575 (9th Cir. 2004).

16    **A.**  **The Settlement Is Presumed To Be Fair, Adequate, And Reasonable**

17    "Before approving a class action settlement, the district court must reach a reasoned

18  judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion

19  among, the negotiating parties. . . ." *City of Seattle*, 955 F.2d at 1290 (quoting *Ficalora v.*

20  *Lockheed Cal. Co.*, 751 F.2d 995, 997 (9th Cir. 1985)).  Where, as here, the settlement is the

21  product of arm's-length negotiations conducted by capable counsel with extensive experience in

22  complex class action litigation, the court begins its analysis with a presumption that the settlement

23  is fair and should be approved.  *See Newberg*, § 11.41; *see also Ellis v. Naval Air Rework*

24  *Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) ("the fact that experienced counsel involved in the

25  case approved the settlement after hard-fought negotiations is entitled to considerable weight").

26    Each of these factors is present here: Class Counsel have extensive experience in class

27  action litigation, including recent experience in litigation against manufacturers of composite

28  decking materials, and they reached the Settlement with Trex only after extensive investigation

833601.4       - 16 -       CASE NO. 5:09-CV-00670-JF

NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT

1   and substantial negotiation about the specific terms of the Settlement. (Selbin Decl., ¶¶ 3-7, Ex.

2   A; Stephens Decl., ¶ 2-3; Lewis Decl., ¶ 3, Ex. A; Gary Decl., ¶ 3, Ex. A; McShane Decl., Ex. A;

3   Miller Decl., ¶ 4, Ex. A; Shelquist Decl., ¶ 3, Ex. A.)

**B.    All Of The Relevant Factors Support Final Approval Of The Settlement**

**1.    The Value of the Settlement, and the Substantial Benefits it Provides to Class Members, Support Final Approval**

7        The Settlement provides relief for all Class members whose decks exhibit Surface

8   Flaking.  The Settlement provides replacement product or a cash equivalent at retail price for any

9   defective Trex Product (i.e., Trex Product exhibiting the Surface Flaking defect), and requires

10  Trex to cover all shipping costs for replacement product.  If more than 50% of a Class Members'

11  Trex decking boards exhibit the Surface Flaking defect, Trex will replace all of the Trex decking

12  boards or provide a cash equivalent at retail price.  This benefit is not available under the

13  warranty.  (Docket No. 78, Ex. A, § D, ¶ 1(a).)  Class Members will also receive partial recovery

14  of labor costs based on the amount of the Trex Product to be replaced, even though Trex's

15  warranty excludes such costs.  (*Id.* at ¶ 1(b).)  The Settlement treats all Class Members fairly and

16  equally as each Class Member's recovery is based on the amount of his or her Trex Product that

17  has experienced Surface Flaking.  Both the amount of replacement product and the labor payment

18  each Class Member receives are proportionate to the harm he or she has suffered.  To ensure

19  fairness, the Settlement also includes an appeals process (*id.* at 15, ¶ 6), and annual reporting of

20  the progress of the claims process to Class Counsel.  (*Id.* at 15-16, ¶ 8.)

21       In considering the *Okano* Plaintiffs' objections at the preliminary approval stage, the

22  Court noted that the value of the settlement exceeded the warranty protection in that it provides

23  labor costs, shipping, and enhanced recovery where there is more than fifty percent failure of a

24  structure's Trex decking boards.  (Docket No. 81 at 7.)  As a result, the Court found that there

25  was value to the Settlement.  (*Id.*)

26       The vindication and enforcement of the Class' legal rights is undoubtedly of value to

27  Class members.  For example, in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998),

28  objectors claimed that a nationwide settlement which provided for replacement of defective

1    automobile latches was inadequate because the manufacturer had previously agreed with the

2    federal government to replace the latches.  *Id*. at 1019.  In affirming the district court's final

3    approval of the settlement, the Ninth Circuit noted that the settlement was valuable because it

4    freed the class from having to prove the defect, and provided for supervision of the replacement

5    scheme by Class Counsel and the court.  *Id*. at 1027.  Similar benefits are conferred here.  While

6    Trex's warranty provides a laundry list of reasons why it may reject claims (*see* Selbin Decl.,

7    Ex. A at 1-2), Trex cannot consider any of those factors in evaluating claims under the

8    Settlement.  Rather, proof of Surface Flaking mandates compensation by way of replacement

9    material and/or cash reimbursement.  (Docket No. 78, Ex. A at 12.)  Claim denials are subject to

10   review by Class Counsel and a neutral arbitrator.  (*Id*. at 15.)  The Court will also retain

11   jurisdiction to ensure the Agreement is effectuated according to its terms.  Just as in *Hanlon*, this

12   Settlement vindicates and enforces the Class's legal rights, and in doing so confers a substantial

13   benefit to the Class.

14   **2.      The Risks Inherent in Continued Litigation Support Final Approval**

15   The Settlement serves the interests of the Class.  Although Class Counsel believe that all

16   claims asserted in the Complaint are meritorious, they understand the significant burdens

17   Plaintiffs would have faced to obtain a class judgment against Trex, including obtaining class

18   certification and prevailing on their legal claims.  Moreover, the outcome of trial and any appeals

19   are inherently uncertain and involve significant delay.  The Settlement avoids these challenges

20   and provides prompt, substantial relief for Class Members which weighs in favor of final

21   approval of the Settlement.  *City of Seattle*, 955 F.2d at 1291.

22   As the Court noted in its Order granting preliminary approval, there is no guarantee that

23   Plaintiffs would be able to recover damages above and beyond what is provided in the warranty.

24   (Docket No. 81 at 7.)  The Settlement recognizes this risk and provides significant benefit in light

25   of it.

26

27

28

**3.**   **The Discovery and Investigation Completed Before Settlement Favor Final Approval**

By the time the parties reached the Settlement, they had compiled sufficient information and conducted extensive analyses to assess the strengths and weaknesses of their respective cases, and to make a thorough appraisal of the adequacy of the Settlement.  Specifically, Class Counsel reviewed Trex's confidential product formulation, and, together with Plaintiffs' expert, inspected and tested the Trex Product to assess the nature and scope of the alleged defect.  In addition, Class Counsel was in contact with over 450 inquiries by Trex purchasers.  Counsel and their experts met with Trex on numerous occasions, including meeting with their representative regarding research and development.  Trex provided Class Counsel with significant confidential information regarding the Trex Product through informal discovery.  Based on this exhaustive investigation of the factual and legal bases for Plaintiffs' claims, Class Counsel determined that the Settlement provides an excellent result for the Class.  (Declarations of Selbin ¶ 36; Stephens ¶ 13; Gary ¶ 12; Shelquist ¶ 10; Lewis ¶ 15; Miller ¶ 13; McShane ¶ 10.)  *See In re Mego Fin. Corp. Securities Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (class counsel's significant investigation, research, and work with experts throughout the litigation supported approval of settlement, even absent extensive formal discovery).

**4.**   **The Terms and Conditions of the Proposed Settlement Favor Final Approval**

As discussed above, the Settlement provides meaningful benefits, including those not otherwise available under the warranty.  The straightforward claims process applies equally to all Class members, and assistance is available—from Class Counsel and Trex—for those who need help in completing claim forms.

**5.**   **The Recommendation of Experienced Class Counsel Supports Final Approval**

The judgment of experienced counsel regarding the settlement is entitled to significant weight, *see, e.g., Hanlon*, 150 F.3d at 1026, and the recommendation of experienced class counsel

1   should be given a presumption of reasonableness.  *See Boyd v. Bechtel Corp.*, 485 F.Supp. 610,

2   622 (N.D. Cal. 1979).

3        Class Counsel in this case, who are experienced and skilled in consumer class action

4   litigation, support the Settlement as fair, reasonable, and adequate, and in the best interests of the

5   Class as a whole.  Class Counsel conducted a comprehensive legal and factual investigation of the

6   claims, and Class Counsel firmly believe that the proposed Settlement Agreement easily satisfies

7   Rule 23(e)'s requirements and is in the best interest of all Class members.  (Declarations of Selbin

8   ¶ 36; Stephens ¶ 13; Gary ¶ 12; Shelquist ¶ 10; Lewis ¶ 15; Miller ¶ 13; McShane ¶ 10.)

9        Moreover, this factor is especially relevant in this case given Class Counsel's experience

10  in a decking case.  In prosecuting this case, Class Counsel were benefited by their settlement of a

11  consumer class action wherein Plaintiffs alleged a mold spotting defect in ChoiceDek brand

12  composite decking and railing products.  *See Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537 (W.D.

13  Wash. 2009).

14       The ChoiceDek case proceeded in much the same manner as this one.  After a lengthy

15  investigation, but before filing a complaint, Plaintiffs' counsel (which included most of the

16  undersigned firms) met with Defendants to discuss an early resolution to the matter.  Over the

17  course of nine months, the parties conducted joint deck inspections, retained and consulted wood

18  science experts and mycologists, traded relevant and proprietary information, and engaged in

19  arms-length, contested negotiations to reach an acceptable agreement.  The mold spotting claims

20  were ultimately resolved using a creative Settlement that provided tiered and staged relief

21  depending on the extent of the alleged defect in the claimant's deck.  In fact, in the ChoiceDek

22  settlement, product replacement/reimbursement represents the highest tier of relief, available only

23  to those with the most significant mold spotting problems.  Here, by contrast, product

24  replacement/reimbursement is the base relief for all claimants.  Moreover, unlike the instant

25  Settlement, the ChoiceDek settlement did not include any recovery for labor costs at all.  *Pelletz*,

26  255 F.R.D. 537 at 542-43.  The ChoiceDek settlement also included payment of $1.75 million in

27  attorneys' fees and costs, and class representative stipends of $7,500 per named plaintiff.

28

1  *Pelletz v. Weyerhaeuser Co.*, No. 08-0334, 2009 U.S. Dist. LEXIS 1803, *19-20 (W.D. Wash.

2  Jan. 9, 2009).

3       In granting final approval, Judge Coughenour of the Western District of Washington noted

4  the risk inherent in consumer class actions, and found that the settlement provided "substantial

5  benefits" to the Class without the delay, expense and risk of litigation. *Pelletz*, 255 F.R.D. at 542-

6  543. *See also Pelletz*, 2009 U.S. Dist. LEXIS 1803, *13-14.

7       Under these circumstances in particular, the considered view of experienced counsel

8  weighs heavily in favor of final approval. *Hanlon*, 150 F.3d at 1026

9            **6.      The Expense and Likely Duration of Litigation in the Absence of a**
             **Settlement Supports Final Approval**
10

11      Another factor courts consider in assessing a proposed class action settlement is the

12  complexity, expense, and likely duration of the litigation had a settlement not been reached. *City*

13  *of Seattle*, 955 F.2d at 1291.  In applying this factor, the Court must weigh the benefits of the

14  Settlement against the expense and delay of continued litigation, including the potential for

15  appeals. *See Churchill*, 361 F.3d at 576.

16      As discussed above, the Settlement guarantees a substantial recovery for the Class while

17  obviating the need for lengthy, uncertain, and expensive pretrial practice, trial, and appeals.  Even

18  if the Class prevailed at trial, Trex would likely appeal any adverse rulings against it.  (Selbin

19  Decl., ¶ 36.)  Accordingly, Class Members would likely not obtain relief, if at all, for a period of

20  years.

21            **7.      The Presence of Good Faith and the Absence of Collusion Favors Final**
             **Approval**
22

23      Courts should also consider the presence of good faith and the absence of collusion on the

24  part of the settling parties. *Officers for Justice*, 688 F.2d at 625; *Newberg* at § 11.43.

25  Furthermore, courts recognize that arm's-length negotiations conducted by competent counsel are

26  *prima facie* evidence of fair settlements.  As the Supreme Court has held, "[o]ne may take a

27  settlement amount as good evidence of the maximum available if one can assume that parties of

28  equal knowledge and negotiating skill agreed upon the figure through arm's-length

1  bargaining . . ."  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999).  *See also In re*

2  *Consolidated Pinnacle West Securities*, 51 F.3d 194, 197 n.6 (9th Cir. 1995).

3  　　　As this Court found at the preliminary approval stage, "there is nothing to indicate

4  collusion" here, "especially in light of the documented record of adversarial negotiations."

5  (Order, Docket No. 81, at 6.) Indeed, the proposed Settlement here is the result of intensive,

6  arm's-length negotiations between experienced attorneys who are highly familiar with class

7  action litigation and the legal and factual issues of this case.  (Selbin Decl., ¶¶ 3-7, Ex. A;

8  Stephens Decl., ¶ 2-3; Lewis Decl., ¶ 3, Ex. A; Gary Decl., ¶ 3, Ex. A; McShane Decl., Ex. A;

9  Miller Decl., ¶ 4, Ex. A; Shelquist Decl., ¶ 3, Ex. A.)  Based on these facts, the Court should find

10  that the parties entered the Settlement in good faith.

11  　　　　　**8.**　　　**Class Members' Positive Reaction Supports Final Approval**

12  　　　Finally, the Settlement has received a positive response from the Class.  The reaction of

13  class members to a proposed settlement is an important factor in determining whether a

14  settlement is fair, adequate, and reasonable.  *City of Seattle*, 955 F.2d at 1291.  A court may

15  appropriately infer that a class action settlement is fair, adequate, and reasonable when few class

16  members object to it.  *See, e.g.*, *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir.

17  1977); *Churchill*, 361 F.3d at 577 (upholding district court's approval of class settlement with

18  45 objections and 500 opt-outs from a class of 150,000).  Indeed, a court can approve a class

19  action settlement as fair, adequate, and reasonable even over the objections of a significant

20  percentage of class members.  *See City of Seattle*, 955 F.2d at 1291-96.

21  　　　Both Named Plaintiffs support the Settlement.  (*See* Declarations of Eric Ross and

22  Bradley S. Hureth, filed herewith.)  Further, as of the date of filing, only thirty-six (36) Class

23  Members had opted out of the Settlement, and only two (2) Class Members had objected to it.

24  This is particularly significant in light of the success of the Notice Program, which included

25  individual notice to approximately 18,000 unique names and addresses, publication notice in the

26  *USA Today* on August 18, 2009, publication notice in *TV Guide* between August 24 and

27  September 6, 2009, a press release on July 31, 2009, and a Settlement website. (Perrone Decl. at

28

1  ¶¶ 4-7.)  The scarcity of objections and requests to opt out of the Settlement indicate the broad,

2  class-wide support for the Settlement and supports its approval.  *Marshall,* 550 F.2d at 1178.

3       Neither of the objections that were filed raise issues that warrant rejection of the

4  Settlement.  The primary objection of William J. Langan is that the $225 limit on the labor

5  payment for those who have prior compensated claims is not fair because other Class members

6  may receive more in labor costs under the Settlement.  (Selbin Decl., Ex. G.)  Mr. Langan also

7  takes issue with the formula of $0.18 per linear foot as being too small.  This is also the sole

8  complaint of the other objector, Michael R. Capelle.  (*Id.*, Ex. F.)  In other words, the objectors

9  complain that, by way of Settlement, they will not obtain all of the relief (and perhaps more) they

10  could hope to recover after years of 100% successful litigation.  Unfortunately, that is not a

11  realistic goal, and it is not the standard by which final approval of a settlement is measured.

12  Instead, both objections "offer nothing more than speculation about what damages 'might have

13  been' won had they prevailed at trial."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242

14  (9th Cir. 1998) (*quoting Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.

15  1982)).  As the Ninth Circuit has repeatedly held, "it is the very uncertainty of outcome in

16  litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.

17  The proposed settlement is not to be judged against a hypothetical or speculative measure of what

18  might have been achieved by the negotiators."  *Id.* (*quoting Officers for Justice*, 688 F.2d at 625).

19  The Court explained, "the very essence of a settlement is compromise, a yielding of absolutes and

20  an abandoning of highest hopes."  *Id.*   Although the Settlement terms reached here provide a

21  significant benefit, "[t]he fact that a proposed settlement may only amount to a fraction of the

22  potential recovery does not, in and of itself, mean that the proposed settlement is grossly

23  inadequate and should be disapproved."  *Id.*  (citations and quotations omitted).

24       When addressing this same objection made by *Okano* Plaintiffs' at the preliminary

25  approval stage, the Court recognized that "a settlement by definition requires compromise, and

26  Plaintiffs cannot expect to make a full recovery in the absence of litigation."  (Docket No. 81 at

27  7.)  The Court also found that there was no guarantee that, if the warranty limitations had been

28  contested in litigation, they would be found unconscionable and, in fact, cited authority for the

1  contrary.  (*Id.* ("While it is possible that the disclaimer would be found unenforceable for

2  unconsionability, such a result cannot be presumed.  Limitations of consequential economic

3  damages for consumers are not prima facie unconscionable, U.C.C. § 2-719(3), and such

4  disclaimers in consumer warranties have been upheld where there is no great disparity of

5  bargaining power.  *E.g. Zaremba v. Marvin Lumber and Cedar Co.*, 458 F. Supp. 2d 545

6  (N.D.Ohio 2006).")) The Court further held that the "labor costs, shipping, and additional

7  recovery for more than fifty percent failure exceed the basic entitlement of the warranty and

8  represent value gained through the Settlement." (*Id.*) It also noted that Class Counsel, "after

9  investigation and in light of their broad experience with consumer class actions, decided that a

10 compromise was appropriate."  (Order, Docket No. 81 at 7.)

11      Class Counsel, who are experienced in litigating consumer and class action cases,

12 maintain that this proposed Settlement is in the best interest of the Class and that the two

13 objections are without merit.

14 **VII.   THE COURT CAN APPROPRIATELY ENTER A FINAL ORDER ON BEHALF
15         OF THE CLASS**

16      The Court has provisionally certified the proposed Settlement Class.  All required criteria

17 for class certification remain satisfied.  For the sake of brevity, Class Counsel respectfully refer

18 the Court to the class certification discussion at pages 12-16 of its Memorandum and Points of

19 Authority in Support of the Motion for Preliminary Approval of Settlement, Docket No. 32.  The

20 Court should approve the class certification and enter a final order approving the Settlement on

21 behalf of the certified Class.

22 **VIII.  CONCLUSION**

23      For the reasons stated above, the Settlement is fair, adequate, and reasonable.  Plaintiffs

24 respectfully request this Court grant final approval of the Settlement.

25

26

27

28

1    Dated: September 28, 2009                LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

2
                                             By;        /s/ *Jonathan D. Selbin*
3                                                        Jonathan D. Selbin

4                                            Jonathan D. Selbin (State Bar No. 170222)
                                             Nimish R. Desai (State Bar No. 244953)
5                                            275 Battery Street
                                             San Francisco, CA 94111-3336
6                                            Telephone:  (415) 956-1000
                                             Facsimile:  (415) 956-1008
7
                                             Elizabeth A. Alexander (*pro hac vice*)
8                                            LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
                                             One Nashville Place
9                                            150 Fourth Avenue, North, Suite 1650
                                             Nashville, TN  37219-2423
10                                           Telephone:  (615) 313-9000
                                             Facsimile:  (615) 313-9965
11
                                             Kim D. Stephens
12                                           TOUSLEY BRAIN STEPHENS, PLLC
                                             1700 Seventh Avenue, Suite 2200
13                                           Seattle, WA  98101-4416
                                             Telephone:  (206) 682-5600
14                                           Facsimile:  (206) 682-2992

15
                                             Robert D. Gary (*pro hac vice*)
16                                           Jori Bloom Naegele (*pro hac vice*)
                                             GARY, NAEGELE & THEADO, LLC
17                                           446 Broadway Avenue
                                             Lorain, OH  44052
18                                           Telephone:  (440) 244-4809
                                             Facsimile:  (440) 244-3462
19
                                             Richard S. Lewis (*pro hac vice*)
20                                           James J. Pizzirusso (*pro hac vice*)
                                             HAUSFELD LLP
21                                           1700 K Street, NW, Suite 650
                                             Washington, DC 20006
22                                           Telephone:  (202) 540-7200
                                             Facsimile:  (202) 540-7201
23
                                             Michael McShane
24                                           AUDET & PARTNERS, LLP
                                             221 Main Street, Suite 1460
25                                           San Francisco, CA 94105
                                             Telephone:  (415)-568-2555
26                                           Facsimile:  (415)-568-2556

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Robert K. Shelquist
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 200
Minneapolis, MN 55401-2197
Telephone:  (612)-339-6900
Facsimile:  (612)-339-0981

Charles L. LaDuca
CUNEO, GILBERT & LADUCA, LLP
507 C Street, NE
Washington, DC 20002
Telephone:  (202)-789-3960
Facsimile:  (202)-789-1813

*Attorneys for Plaintiffs and the Proposed Class*