Jeff D. Friedman (173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001

Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*Counsel for Select Plaintiffs and*
*Lead Counsel for the Proposed Class*

[*Additional counsel listed on signature page*]

Honorable Jeremy Fogel

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DEAN MAHAN, GRETCHEN SILVERMAN, J. STEPHEN TISDALE, STEVEN MCKENNA, THOMAS SCHAUPPNER, MARJORIE ZACHWIEJA, JOHN FORCELLA, SHEILA SHAPIRO, SABRINA W. HASS and DR. LANNY W. HASS, AMY BIONDI-HUMMFAN, and BRIAN HATHAWAY, on behalf of themselves and all others similarly situated,<br><br>                       Plaintiffs,<br><br>   v.<br><br><br>TREX COMPANY, INC., a Delaware corporation,<br><br>                       Defendant. | No. CV 09-00670-JF<br><br>FIRST CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT, BREACH OF EXPRESS WARRANTY, BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, STATE CONSUMER PROTECTION ACTS, FRAUDULENT CONCEALMENT/NONDISCLOSURE, and FRAUDULENT MISREPRESENTATION |

1

**TABLE OF CONTENTS**

2

**PAGE**

3     I.        INTRODUCTION ............................................................................................. 1

4     II.      JURISDICTION AND VENUE ....................................................................... 1

5     III.    THE PARTIES ................................................................................................. 2

6           A.    The Plaintiffs ....................................................................................... 2

7           B.    The Defendant ..................................................................................... 8

8     IV.    GENERAL ALLEGATIONS ........................................................................... 8

9     V.      TOLLING ...................................................................................................... 14

10     VI.    CLASS ACTION ALLEGATIONS .............................................................. 15

11     VII.   CLAIMS FOR RELIEF ................................................................................ 17

12     COUNT I Violation of Magnuson-Moss Warranty Act ............................................ 17

13     COUNT II  Breach of Express Warranty and Violations of Article 2 of the Uniform Commercial
            Code ......................................................................................................... 19

14

15     COUNT III  Breach Of The Implied Warranty Of Merchantability ................................. 24

    COUNT IV  Violation of Consumer Protection Statutes ............................................ 26

16

17     COUNT V  Fraudulent Concealment/Nondisclosure ............................................... 34

    COUNT VI  Fraudulent Misrepresentation .......................................................... 36

18

19     PRAYER FOR RELIEF ............................................................................................ 37

    DEMAND FOR JURY ............................................................................................. 38

20

21

22

23

24

25

26

27

28

For their first consolidated complaint against Trex Company, Inc. ("Trex"), plaintiffs, on behalf of themselves and all others similarly situated, allege as follows:

## I.    INTRODUCTION

1.     Like thousands of consumers across the country, plaintiffs purchased material manufactured by Trex to build decks at their homes.  Trex decking boards are not natural wood products; rather, they are composites made from recycled plastic and wood fibers.  Trex touts its product as being superior to real lumber and low maintenance in nature, and it prices the product accordingly.  But due to a defect, Trex decking exhibits mold and/or dark spotting at extensive and alarming rates, all well beyond what should be occurring with a product meant for the outdoors, and well beyond what consumers expected based on Trex's representations as to the characteristics of its products.  Furthermore, this mold or dark spotting, which covers large areas of installed decks, is highly unusual, in that it often appears to emanate from within the Trex material itself, starkly illustrating that there is a defect in the product.

2.     In response to complaints about the defect, which, upon information and belief, Trex knew about even as it was placing defective product on the market, Trex advises its customers to clean their decks with harsh chemical products that often fail to work, or that appear to work in part before the mold or dark spotting recurs as badly or worse than before, and that often discolor their decks.  The company does not pay for the costs associated with attempting to clean the decks, and it does not replace the defective material.  It also refuses to cover the cost of labor to remove the defective material and to install replacement boards.  But as Trex well knows, these costs often far exceed the cost of the boards themselves.

3.     In its dealings with the plaintiffs and other consumers, Trex has violated the federal Magnuson-Moss Warranty Act, state sales laws, and various state consumer protection acts.  Plaintiffs bring this suit in order to vindicate their own rights and those of consumers nationwide.

## II.    JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, *et seq.*, which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in

FIRST CONSOLIDATED CLASS ACTION COMPLAINT                    - 1 -
CV 09-00670 JF
010095-13  404945 v1

controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant. The amount-in-controversy and diverse-citizenship requirements of CAFA are satisfied in this case. Given that Trex sells its products nationwide, that there are widespread reports of the misrepresentations and defects alleged herein, and given the damage-multipliers available under various state consumer protection laws, plaintiffs believe, and therefore allege, that the aggregate amount in controversy well-exceeds $5 million. As to CAFA's diverse-citizenship requirement, plaintiffs are citizens of California, Connecticut, Florida, Illinois, Maryland, Michigan, New Jersey, New York, North Carolina, Ohio, and Washington, while Trex has its principal place of business in Virginia, such that Trex is considered a citizen of that state.

5. Trex, a corporation, transacts business in this judicial district and otherwise is subject to personal jurisdiction in this judicial district, where it sells a good deal of its products. Accordingly, venue is appropriate in this Court per the terms of 28 U.S.C. § 1391(b) and (c). Furthermore, Trex purposely sought to transfer, and succeeded in transferring, the instant matter to this judicial district. Trex is, therefore, estopped from seeking any further transfer of this matter. Moreover, this Court is now well-familiar with the players, applicable law, and fact patterns attending this case of nationwide scope, having recently presided over a related case, such that venue in this Court is not only proper but ideal.

### III. THE PARTIES

**A. The Plaintiffs**

6. Plaintiff Dean Mahan resides in Citrus Heights, Sacramento County, California. In approximately June 2005, Mr. Mahan purchased Trex decking materials for approximately $9,000.00 to replace a wooden deck on his home. Mr. Mahan chose Trex decking based on advertisements that described the products as "low maintenance." Mr. Mahan had the deck installed by a professional contractor in accordance with Trex's instructions. Within one year of purchase, the decking started exhibiting significant surface flaking. Mr. Mahan contacted a Trex service representative who instructed him to call Barodini Construction in Sacramento, California. Barodini Construction inspected and replaced the deck with more Trex materials. Trex paid the for the replacement, including all labor expenses to remove the deck and install the new one. Within

two years after it was installed, the second Trex deck started to develop extensive mold spotting in the form of noticeably large black and gray spots. Ms. Mahan again contacted Trex and a customer service representative instructed him to purchase an expensive chemical cleaner to clean the deck, which he did. Since that time, Mr. Mahan has expended considerable time and expense attempting to clean the mold spots using the methods recommended by Trex, without success. Despite his repeated efforts to clean the deck, the mold and/or fungal growth and attendant discoloration continue to reappear.

7.     Plaintiff Gretchen Silverman resides in Torrington, Litchfield County, Connecticut. Ms. Silverman purchased Trex decking at The Home Depot in Torrington, Connecticut in or around June-July 2008, paying almost $9,200 for it, plus the cost of necessary hardware, including fasteners, and materials. Ms. Silverman purchased Trex decking because she was persuaded by Trex marketing materials that Trex decking would require little if any maintenance and that it was designed and manufactured to stay as beautiful as the samples that she saw at the store. Though she saw a sign or pamphlet indicating that Trex had a 25-year warranty when she purchased her product, she was not given a copy of the actual warranty document before or at the time of sale. All told, including professional installation, her Trex deck cost almost $21,100. Though Ms. Silverman believed, due to Trex representations, that her deck would be built with quality decking material, it began to develop extensive molding or black spotting shortly after it was installed. By the summer of 2009, it was exhibiting molding or spotting over the entire deck and Trex railing as well. She has undergone the difficult process of cleaning the deck and railings, including a two-day cleaning project using Corte Clean in May of this year, but to no lasting avail. Photographs showing examples of the mold or black spotting that has returned since the May 2010 two-day cleaning are attached as Exhibit 1.

8.     Plaintiff J. Stephen Tisdale resides in Gulfport, Pinellas County, Florida. Mr. Tisdale originally purchased his Trex decking products in December of 2006. He decided to purchase Trex after seeing an advertisement in a trade publication and in Home Depot that described the product as "low maintenance." Prior to purchase, he also saw the stamp on the product that represented there was a 25 year warranty; however, he was not provided and did not

see the actual written warranty. At Trex's expense, the first materials were replaced because they had staining that Trex attributed to the shipping of the product. He installed his deck with the replacement product in early 2007. Mr. Tisdale purchased the Trex decking product from Home Depot for roughly $3,625. Mr. Tisdale is a building contractor who owns a construction company, and his deck was installed in February 2007 by his professional carpenters under his direct supervision and in accordance with Trex's instructions. The total labor costs were approximately $2,400. Within two to three months of the installation of his deck, Mr. Tisdale's deck developed extensive mold, mildew and/or fungal growth, and widespread discoloration in the form of noticeably large black and gray spots. In late 2007 or early 2008, Mr. Tisdale had his deck cleaned with a cleaning product recommend by Trex. The mold and/or fungal growth and attendant discoloration reappeared after approximately one month.

9.     Plaintiff Steven McKenna resides in Tinley Park, Cook County, Illinois. In approximately September or October 2005, Mr. McKenna purchased his deck from Fox Home Center, Inc. in Frankfort, Illinois for approximately $14,000. Mr. McKenna chose Trex decking based on its reputation of being a low maintenance decking product. Mr. McKenna does not recall seeing Trex's warranty prior to purchasing his deck. The deck was professionally installed by Jim Jensen Construction for approximately $8,000. Since the installation of his deck, Mr. McKenna's deck developed extensive mold, mildew, and/or fungal growth, and widespread discoloration in the form of noticeably large black and gray spots. At the request of counsel for plaintiffs, a representative from Trex cleaned the deck in approximately August, 2008. Shortly after Trex's representative cleaned the deck, the mold spots returned. Photographs of Mr. McKenna's deck subsequent to the cleaning showing that the spots returned are attached as Exhibit 2.

10.    Plaintiff Thomas Schauppner lives in Arnold, Anne Arundel County, Maryland. In August 2008, Mr. Schauppner, having been persuaded by Trex marketing materials and samples at the store that Trex was a beautiful, easy- to no-maintenance product, purchased some $650 worth of Trex Accents decking at The Home Depot in Annapolis, Maryland. He also purchased the expensive fasteners required for his decking project, spending some $230 on these. He was not given a copy of a Trex warranty document at or before the time of purchase. Mr. Schauppner

installed the deck, which is located at the back of his home, himself, following Trex's instructions. The installation project took him approximately 20 hours to complete. Shortly after installing his decking, Mr. Schauppner noticed that mold or other dark spotting began to appear on several boards. He tried to clean it off via various methods, but it would not go away. Over time, the spotting became more extensive, to the point that it now covers two-thirds if not more of his deck. More cleaning and scrubbing has not removed the spotting. Also, the spotting is odd; rather than appearing merely on the surface, the mold or other dark spotting appears to be coming up from within the decking boards.

11.     Plaintiff Marjorie Zachwieja resides in Macomb, Macomb County, Michigan. In June 2007 Ms. Zachwieja and her husband added a 6' x 25' porch to their home. Having been persuaded by Trex marketing that Trex decking was durable and low- to no-maintenance, they purchased Trex Accents for their project at The Home Depot in Macomb Township, Michigan. They were not given a copy of a Trex warranty document at or before the time of purchase. Shortly after building their porch, the Zachwiejas noticed that a few faint spots had begun to develop on the decking. At that point, they were not alarmed; given Trex's marketing claims, they had no reason to believe that a few spots would portend the extensive problem that would develop. But by the late fall of 2009, there was an abundance of dark spots, all over their decking. This spotting is unusual, in that it appears not to be a mere surface mold; rather, it appears as if the mold or other spotting is emanating from within the decking boards. Once the decking began to exhibit extensive dark spotting, the Zachwiejas undertook a major cleaning of their porch, spending hours trying to clear away all the mold or dark spotting, but to no avail; the spotting would not go away. This was the same story subsequently. Despite more hours spent attempting to clean their decking with various solutions, including a product recommended by Trex's dealer The Home Depot and made specifically for use on products such as Trex decking, the spots did not and will not go away. Recently the Zachwiejas tried to sell their home, and prospective buyers inquired about the spotting. The Zachwiejas had to respond that it is some sort of mold, and that they have not been able to clean it off the decking. This, in turn, led these prospective buyers to express grave concern about the porch. Ms. Zachwieja believes, and therefore alleges, that this concern caused some if

not all of these prospective buyers to look elsewhere for a home. Since then, the Zachwiejas have taken their home off the market. Ms. Zachweija and her husband know that something will have to be done about the porch before they can put their home back on the market. The Zachwiejas spent some $900 on their Trex decking and another $300 on the required fasteners. Ms. Zachwieja's husband, who is a contractor, installed the decking. The value of the labor to install the deck was approximately $2,000. The labor estimate to rip out the defective product and replace it with new, non-defective product, such as treated wood, is some $2,000, plus the cost of the product and supplies, in addition to the cost of disposing of the molded or spotted product.

12.     Plaintiff John Forcella resides in Howell, Monmouth County, New Jersey. In June 2006, he installed a deck at his home made of Trex Accents decking material which he purchased for approximately $3,000 at Woodhaven Lumber. Mr. Forcella purchased Trex based on representations by the sales person at Woodhaven Lumber and after looking at the representations on Trex's website that the product was low maintenance. He did not see the warranty before he purchased the product, but did see the stamp on the product that indicated that the warranty was for 25 years. Mr. Forcella installed the deck himself. By January 2007, Mr. Forcella's Trex deck had developed extensive mold, mildew and/or fungal growth, and widespread discoloration in the form of noticeably large black and gray spots. Mr. Forcella has expended considerable time and expense attempting to clean the deck using the methods recommended by Trex, without success. Despite his repeated efforts, the mold spotting and/or fungal growth and attendant discoloration have reappeared.

13.     Plaintiff Sheila Shapiro resides in Amherst, Erie County, New York. In or around January 2008, Ms. Shapiro, having seen Trex advertisements touting the durability and easy- to no-maintenance features of its decking products, and having seen beautiful samples of the product at retailers, procured an estimate from a contractor to build a front porch (approximately 8' x 9') and back deck (12' x 12') at her home using Trex Accents. Thereafter, she engaged the contractor to build her porch and deck using that Trex material, which the contractor purchased as her agent. The contractor installed her Trex porch and deck in the spring or early summer of 2008. She did not receive a copy of a Trex warranty document at or before the time of purchase of the materials,

and none was attached to the decking brought to her home. The cost to build her front porch, including labor and materials, was $1,960 before tax; the cost to build her back deck, including labor and materials, was $5,250 before tax. After her decking was installed, in or around early spring 2009, it began to develop black spotting or mold both on her porch and on the deck at the back of her house. Ms. Shapiro tried cleaning away the black spotting with various products, spending hours and hours doing so, but to no avail. Over time, the spotting has covered nearly all the surfaces of the decking at the front and back of her home. Repeated cleanings have not remedied the problem, and indeed, the mold or black spotting appears to be coming up from within the decking boards. The problem is so bad now that Ms. Shapiro has to ask visitors to take off their shoes before entering her house, for fear that they will track the mold or other growth inside her home.

14. Plaintiffs Sabrina W. Hass and Dr. Lanny W. Hass reside in Raleigh, North Carolina. In approximately December, 2007, Dr. and Mrs. Hass purchased a deck made of Trex decking materials to be included as part of the construction of a new home after their builder told them that the product was low maintenance. They did not see the warranty prior to their purchase. The deck was professionally installed by Toll Bros. for approximately $2,770 on or about August 2007. Approximately one year later, Dr. and Mrs. Hass began to notice black mold and fungal spotting on the deck. At the request of plaintiffs' counsel, a representative from Trex cleaned the deck in November 2008. After Trex's representative cleaned the deck, the mold spots returned. Photos of the deck after Trex's cleaning showing that the spots returned are attached as Exhibit 3. Mrs. Hass again attempted to clean the deck using the exact same method used by Trex's representative on September 26, 2009. Despite her efforts, by December 15, 2009, extensive mold spotting, fungal growth, and attendant discoloration had reappeared. Photographs of the deck on December 15, 2009, are attached as Exhibit 4.

15. Plaintiff Amy Biondi-Huffman resides in Powell, Delaware County, Ohio. She purchased Trex decking from Home Depot in or around May 2008 for approximately $3,500, and does not recall seeing the warranty prior to purchasing the product. She chose Trex after seeing advertisements on Trex's website, including the representation that the product was low

maintenance.  Ms. Biondi-Huffman is a building contractor and hired a professional carpenter to install the deck on her home.  The contractor installed the deck in accordance with the instructions provided by Trex.  Ms. Biondi-Huffman began to notice black mold and fungal spotting in early Summer of 2009.  Despite her efforts to clean the deck using the methods recommended by Trex, extensive mold spotting, fungal growth, and attendant discoloration have reappeared.

16.      Plaintiff Brian Hathaway resides in Snohomish, Snohomish County, Washington. In May, 2006, he replaced a wooden deck on his home with Trex Origins decking which he purchased for approximately $1,400.  He chose Trex based on advertisements he saw in magazines and elsewhere that described the products as low maintenance.  He did not see the written warranty prior to his purchase, nor, to the best of his recollection, was he provided the warranty. Mr. Hathaway, who owns and operates a home construction company, installed the deck himself with the help of a construction worker.  By the Fall of 2006, Mr. Hathaway's Trex deck had developed extensive mold, mildew, and/or fungal growth, and widespread discoloration in the form of noticeably large black and gray spots.  Plaintiff Hathaway has since expended considerable time and expense attempting to clean the deck using the methods recommended by Trex.  Despite his repeated efforts, the fungal growth, mold spotting, and attendant discoloration have reappeared.

**B.      The Defendant**

17.      The defendant is a Delaware corporation with its principal place of business in Winchester, Virginia.  It describes itself as the nation's largest manufacturer of "wood-alternative" decking, railing, and fencing products.  Trex is a spinoff of ExxonMobil Oil Corporation (which was known as Mobil Oil Corporation as of the time of the spinoff).

**IV.      GENERAL ALLEGATIONS**

18.      Trex heavily advertises its decking products directly to consumers, including by way of advertisements and its Internet web site.  Currently, for example, Trex states that the plastic in its materials "shields the wood from moisture and insect damage, preventing rotting and splintering."  It states that "[t]he maintenance problems that come with wood decks don't come with Trex."  It claims that its decking material "will not rot or deteriorate due to harsh weather or insects."  It represents that "Trex resists damage from moisture and sunlight, making it the natural

choice for pools, hot tubs and spas." And it claims that its decking and railing products "require only periodic cleaning to stay beautiful for years to come – no need for sanding, staining or painting, ever." The essence of its marketing strategy is to tout its composite materials as superior to real wood products, that is, as the best material available for decking. In tandem with this marketing strategy, Trex charges prices for its supposedly premium products that are well in excess of those charged for real lumber materials.

19.     Trex is a wood-plastic composite decking material that Trex manufactures using a blend of plastics and recycled post-industrial wood fibers. As stated above, Trex is advertised as a premium material suitable for constructing outdoor decks, railings, and other related structures, including structures in high moisture areas, such as around pools and hot tubs. Trex is typically more expensive than decking products made from alternate materials, such as treated wood, redwood, and cedar.

20.     Upon information and belief, Trex has been manufacturing, advertising, selling and warranting Trex for consumer and commercial use since 1996.

21.     Decks and railings are generally vulnerable to mold, mildew, and other fungus growth, all of which require a constant presence of moisture to grow. One common preventive measure is to apply "treatments," "stains," or "sealants" that are designed to prevent the growth of these organisms on the deck and railing materials, in part by sealing out water.

22.     Over and over again in its advertisements, Trex has advertised its decking as being "low maintenance" and stated that there is no "need for staining and sealing, so there's more time to actually enjoy your deck." *See* Collective Exhibit 5. Trex broadly disseminated these uniform representations through communications with consumers, and through communications with wholesalers, retailers, and others in the chain of distribution that were ultimately passed on to plaintiffs and the Class members.

23.     Because the product is said to be "low maintenance," Trex further claims that owners will save money they would otherwise spend on maintenance by using Trex instead of wood decking. For instance, it represents "Trex costs less over time- After a slightly higher initial investment, Trex proves to be a superior value over years of worry-free ownership." Exhibit 6

(emphasis in the original). It also states that "Because it requires so little maintenance, Trex makes for a better value over the life of your deck purchase." *Id.*

24.     Trex's advertising materials also boast of the long-lasting beauty of its product. For instance, Trex has advertised that its "decking and railing products are made from a unique combination of reclaimed wood and plastic, giving you the best qualities of both materials.… It looks great year after year," that Trex "provide[s] unmatched good looks and longevity," and that "Trex products are engineered and manufactured to deliver superior durability, ease of maintenance, and great looks for many years- something wood can't do." *See* Collective Exhibit 7.

25.     Trex also touts its products' "[r]esistance to moisture," and water resistance, purportedly making its products "ideal for use around pools, hot tubs and spas." *See* Collective Exhibit 8.

26.     Trex warrants its products for twenty-five (25) years from the date of original purchase. The warranty provides that "Trex products shall be free from material defects in workmanship and materials, and shall not check, split, splinter, rot or suffer structural damage from termites or fungal decay." See Exhibit 9.

27.     In fact, as confirmed by expert testing, Trex decking materials experience mold, mildew, and/or other fungal growth when properly installed and maintained. Plaintiffs and their counsel have retained a wood scientist and a mycologist who examined product samples from multiple decks and confirmed the nature of the defect. They have also confirmed the ineffectiveness of cleaning methods suggested by Trex for mold and/or fungal spotting.

28.     According to plaintiffs' wood science expert who has inspected the product, the mold, mildew, and/or fungal growth results from the fact that the wood fibers within the decking product are not properly encapsulated, and thus hold moisture. As a result, cleaning is a temporary fix that will never actually correct the defect, and will not stop the unsightly spotting.

29.     Based upon expert testing, and as demonstrated by Trex's own cleaning of multiple Trex decks belonging to plaintiffs, cleaning methods recommended by Trex are ineffective. They are also extremely expensive and beyond what can be expected of a reasonable homeowner.

30.     The growth occurs regardless of proper installation, maintenance and cleaning, and recurs quickly after being cleaned using the very process(es) Trex recommends.

31.     Whereas a reasonable consumer of decking products would expect to conduct some routine maintenance and clean their deck every few years as regular maintenance, Trex decking requires cleanings much more frequently, and even then cleanings are ineffective to remove or prevent the quick return of mold spotting and/or fungal growth.  Trex knows all of this but actively conceals this information from consumers.

32.     Plaintiffs and their counsel have been in contact with several hundred owners of Trex decks and other Trex structures nationwide who have experienced the defect.  These purchasers all have remarkably similar, if not identical experiences.  For instance, many homeowners report that they purchased Trex product for a premium expecting that there would be minimal maintenance; yet, shortly after their decks were installed, the defect manifested.  Many also report that they have attempted to clean their decks using the protocol recommended by Trex and that if the cleaning is effective at all, it only temporarily removes the spots.  They also describe the recommended cleaning method as expensive and time consuming.

33.     For instance, a California homeowner reported, "We paid a premium price so our deck would stay beautiful without additional time-consuming maintenance.  The Trex website states that you can buy a mold-removing agent and scrub it off.  We tried that, since our deck is only one month old and looks terrible, but it does not work, even with significant scrubbing."

34.     One homeowner from Florida reported, "A few months after installing tre[x] products it became covered with mildew. What was advertised as trouble free material costs as much or more than a wood deck to maintain, the cleaning materials are more expensive than those to clean and maintain a wood deck, and after the first cleaning I have at least 3-5 different shades of the original color on the deck. Trex rep said I should paint it which defeats the whole purpose of using Trex in the first place."

35.     Another homeowner from Florida reported, "Right after they installed it, it started getting black round spots on it. The spots are not on top of the board, but are coming from the inside.  It does not come off."

FIRST CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-00670 JF
010095-13 404945 v1

- 11 -

36.     A homeowner from Illinois reported, "My Trex deck looked great for about 1 month, then it started getting black spots all over it.  I paid a lot of money for this because it was supposed to be virtually maintenance free.  This deck requires much more maintenance than my old wood deck, costs 3 times the price, and looks worse most of the time."

37.     A homeowner from New Jersey reported, "Within a month, the spots have appeared over the entire surface of the deck and are not fully removed with the 'deck cleaners' that Trex recommends."

38.     A homeowner from North Carolina reported that her Trex deck started to manifest the defect even before installation was complete.  She stated, "The job started about 1 month ago but because of weather, it is still not complete.  What decking is complete has already spotted black...all over the deck.  I haven't tried to clean it yet but thought I shouldn't be bothered already when my deck isn't even 2 months old!!  We have had it professionally installed and it is the Trex Accents."

39.     Another homeowner from North Carolina reported that "We used a qualified licensed contractor to install the deck.  We were very pleased with the Trex deck and looked forward to never again having to sand, stain and seal. . . . The spots have increased to cover most of the deck area. . . .On a visit to a local restaurant, I noticed the decking material used outside was the exact same as we had purchased, Trex Accent – color – Merlot. The decking material was covered with the same black spots.  Obviously, this is not an environmental issue as Trex continues to claim. This is clearly a product defect. The numerous complaints registered and information circulated on the web from various customers attest to this fact."

40.     An Ohio homeowner echoed these experiences: "By the beginning of the Spring of 2008 there was spots everywhere. I've cleaned them once with the recommended cleaner from their website but they came back even worse within 30 days. I'm extreme[ly] dis[s]apointed in the product and I'm doing just the opposite of why I purchased it in the first place. I don't want to clean it every month! The total purchase was for around $2000.00 and I kept the receipts. This company totally misrepresented it's [sic] product and after reading about it further it is in my opinion that it is defective."

41. Similarly, a Washington homeowner reported: "[B]lack spots and mold that won't come completely out….Use what is recommended by Trex website, which doesn't take care of the problem."

42. Trex decking owners have posted strikingly similar experiences on website "message boards." For instance, in the "DIY Chatroom," customers posted on July 21, 2007, that "Within a few months [of installation], we had spots occurring all over it. . . We had it gently pressure washed, and still, the spots continued to increase. By this May, the entire 3000 square foot deck had spots." The homeowner also reported that a Trex representative inspected the deck and, "They brought out an Olympic Deck Stain removal product, and instructed us to apply it full strength, twice if necessary, to attempt to remove spots, which covered almost all of the entire deck. The men agreed that the spots appeared to be mold that was coming from the interior of the product itself. We applied the cleaning product full strength, and were able to remove some of the spots, which were about the size of a nickel. Some still remained. The TREX rep assured us that they would send out a professional to clean it again, but one never materialized." The message continued, "we received a standard form letter from TREX indicating the problem absolutely was 'mold' and 'our fault' and 'not their problem.'" The homeowner concludes that "It is disappointing that for such an expensive, lifetime guaranteed product, the company in fact does not stand up for it, it hides behind it." This posting is attached as Exhibit 10.

43. An entry on <complaints.com> from August 2009 stated, "Our deck is 2 years old this month. We used the recommended cleaner and now there seem to be more mol[d] spots. This is more work tha[n] our wood deck was and 3 times the cost." See Exhibit 11 at 3.

44. Scores of similar messages regarding mold spotting on Trex decks have been posted on the home improvement website, <bobvilla.com>. For example, one posting from November 23, 2009 states, "We also have been very disappointed with our Trex deck, installed in early 2007. Approximately one third of the deck is now covered with mold and mildew spots. After cleaning with products recommended by Trex, these spots are not entirely removed. Even when the spots do appear to wash out, they return in a couple of weeks. The discoloration and fading in the portion of the deck where the cleaners were used is quite ugly, and the spots remain. We submitted

- 13 -

a claim, along with photos, which was just rejected by the Trex company.  I am very disappointed with this product and would not recommend that anyone purchase it." *See* Exhibit 12, attached. Another from June 18, 2007, states, "I have been fighting with Trex also regarding this mold issue. Trex sent me the packet....I complied regarding giving them all the information they requested, several photos, etc.  In so many words, they will do NOTHING! Can anyone help me...do we have any recourse on this issue?" *See* Exhibit 13.

45.     As these reports and the experiences of the plaintiffs and others demonstrate, Trex fails in its purpose of providing suitable material with which to build and maintain a deck or other outdoor structure, and it fails to meet its advertised and warranted qualities of being low maintenance, superior to wood, and fit for use without application of sealants, as evidenced by the persistent and unsolvable mold spotting and fungal growth.

46.     Trex has refused to provide adequate relief to plaintiffs and thousands of others like them whose decks are prematurely failing.

## V.     TOLLING

47.     Because the defect is latent and not detectable until manifestation, plaintiffs and members of the proposed class were not reasonably able to discover them until after installation, despite their exercise of due diligence, and even then Trex failed to disclose that its product was inherently defective.  Accordingly, the discovery rule applies to plaintiffs' claims.

48.     Trex knew of the defect prior to the time of sale, and it concealed that material information from plaintiffs and all consumers.  Any applicable statutes of limitation have, therefore, been tolled by Trex's concealment of material facts.

49.     Trex is estopped from relying on any statutes of limitation because of its concealment of the defect.

50.     Additionally, on June 16, 2008, Trex entered a tolling agreement staying all statutes of limitations regarding the alleged mold spotting defect which continues to the date of the filing of this First Consolidated Complaint.

VI.    CLASS ACTION ALLEGATIONS

51.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure, specifically Rules 23(b)(2) and 23(b)(3), on behalf of the following Class (the "Class"):

> All consumers in the United States who, through the date of entry of judgment,
> themselves or via an agent, purchased any Trex decking material for any consumer
> or household use, or who were transferred ownership of the decking material or any
> structures containing it, where such decking material has exhibited molding or
> mildewing or other dark spotting, discoloration, streaking, or shadowing, and/or the
> expression from within of molding or mildewing or other dark spotting,
> discoloration, streaking, or shadowing.  Excluded from the class are officers,
> representatives, or agents of Trex, as well as the judge presiding over this case and
> his or her immediate family members.

Plaintiffs are prepared as necessary to amend their class definition by way of defining appropriate

multi-state sub-classes.  Plaintiffs anticipate, however, that due to the nature and particulars of

applicable laws, the relief they seek will be available nationwide.

52.    Upon information and belief, there are thousands of members in the above-

described class.  The exact number and identities of fellow members, however, are presently

unknown to plaintiffs, but they are known to Trex and ascertainable via appropriate discovery.

53.    Among the questions of law and fact common to the class are:

a.    Are the Trex decking materials at issue in this lawsuit defective?

b.    Is the mix of materials, or any material, used to make Trex decking materials

a cause of the defects alleged?

c.    Is the manufacturing process a cause of the defects alleged?

d.    When did Trex realize that the decking products it was placing on the market

were defective?

e.    Are the purported exclusions or disclaimers of liability in Trex warranty

documents for consequential and incidental damages, and, more particularly, for removal and

installation labor and freight charges, as well as the costs of fasteners and other necessary supplies,

conspicuous?

f.    In Trex warranty documents, is the purported limitation of liability to

replacement of defective material, or a refund for the purchase price, conspicuous?

g.      Did Trex make, or have a program for making, written warranties readily available for examination by prospective buyers of its products?

h.      With respect to Trex warranty documents, are Trex's purported exclusions of liability for consequential and incidental damages, including for freight charges and labor costs, conscionable, valid, and enforceable?

i.      Were the defects in the Trex decking materials latent?

j.      Have the limited remedies that Trex purports to offer failed of their essential purpose?

k.      Does Trex have a program in place to discourage consumers who bought defective Trex product from seeking all remedies lawfully available to them?

l.      Is part of Trex's strategy to discourage consumers from seeking full redress the inclusion in its warranty documents of purported exclusions of liability for consequential and incidental damages, including for freight charges and labor costs, even though Trex knows that such purported exclusions are unconscionable, invalid, and not enforceable under the circumstances of the consumer transactions at issue?

m.      Has Trex placed products on the market with the knowledge that they were defective, or likely to be defective?

n.      Has Trex advertised its products as having characteristics that they do not have?

o.      Has Trex acted deceptively or unfairly or unconscionably in the marketing of its products?

p.      Has Trex acted deceptively or unfairly or unconscionably in addressing the complaints of consumers who purchased or acquired defective Trex decking materials?

q.      Are Trex's warranty documents subject to reformation?

54.      Plaintiffs' claims are typical of the class because plaintiffs and all members of the Class were injured in the same manner by Trex's violations of provisions of the Magnuson-Moss Warranty Act; by its violations of provisions of Article 2 of the Uniform Commercial Code, as

enacted in the various states, and related principles; and by its unfair or deceptive or unconscionable acts and practices as defined by the consumer protection laws of the various states.

55.     Plaintiffs will protect fully and adequately the interests of all members of the class. Plaintiffs have retained counsel who are experienced in consumer class-action litigation.  Plaintiffs have no interests which are adverse to, or in conflict with, other members of the class.

56.     The questions of law and fact common to the members of the class predominate over any questions which may affect only individual members.

57.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The class is readily definable, and prosecution as a class action will eliminate the possibility of duplicative litigation, while also providing redress for claims which otherwise would be too small to support the expense of individual litigation.

58.     Furthermore, Trex has acted or refused to act, as alleged herein, on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

### VII.     CLAIMS FOR RELIEF

#### COUNT I
#### Violation of Magnuson-Moss Warranty Act

59.     Plaintiffs restate the preceding paragraphs and allegations and incorporate them here by this reference.

60.     The federal Magnuson-Moss Warranty Act ("Magnuson-Moss" or "the Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

61.     Magnuson-Moss provides a cause of action for breach of warranty or other violations of the Act.  15 U.S.C. § 2310(d)(1).  Trex has breached its express warranty to provide goods that are free from material defects in workmanship and materials.  It also has breached its implied warranty of merchantability—which it cannot disclaim per the MMWA, 15 U.S.C. § 2308(a)(1), and because of a pledge it made to remove disclaimers of implied warranties from its written warranties in a nationwide class-action settlement approved and ordered by a New Jersey court in December 2004 (*Kanefsky v. Trex Company, Inc.*, N.J. Sup. Ct. Essex. Cty. No. L-7347-

00)—by failing to provide merchantable goods. Plaintiffs have suffered damages as a result of Trex's breaches of its express and implied warranties as set forth herein; thus, this action lies. 15 U.S.C. § 2310(d)(1)-(2).

62. Trex's written warranties contain terms purportedly limiting its liability relative to defective products to replacement of the product or refund for the purchase price of the product, at Trex's option. These terms appear in the same font and type-size as the rest of the terms of the warranty, they are not bolded, and they are not printed in a contrasting color. In short, they are inconspicuous, and that lack of conspicuousness violates Magnuson-Moss. 15 U.S.C. § 2302(a)..

63. In addition, Trex's written warranties purport to exclude liability for consequential and incidental damages, including for the costs of shipping and labor. These terms appear in the same font and type-size as the rest of the terms of the warranty, they are not bolded, and they are not printed in a contrasting color. In short, they are inconspicuous, and that lack of conspicuousness violates Magnuson-Moss. 15 U.S.C. § 2302(a)..

64. Furthermore, plaintiffs and members of the proposed class do not receive written warranty documents before, at, or around the time that the material was purchased. Also, warranty documents and terms are not posted at the places where plaintiffs and members of the proposed class purchased their decking material. Trex's failure to provide warranty materials to retailers, such that they can be made provided to, and readily available for examination by, prospective buyers, violates Magnuson-Moss. 15 U.S.C. § 2302(b)(1)-(2); 16 C.F.R. § 702.3.

65. Because of the inconspicuousness of purported terms of limitation and exclusion in Trex's written warranties, and because Trex failed to provide directly or via its retailers copies of written warranties containing these purported limitations and exclusions to consumers prior to the time of sale, plaintiffs have suffered damages and are entitled to other legal and equitable relief as requested herein. 15 U.S.C. § 2310(d)(1).

66. Finally, at the time it sold its products to plaintiffs and the proposed class, Trex knew, having experienced previous grave difficulties in its manufacturing processes resulting in defective product, that it had not satisfactorily remedied its manufacturing processes and that it was still manufacturing and distributing defective product; thus, Trex's warranty disclaimers,

exclusions, and limitations were unconscionable because they disclaimed a defect known but not disclosed.

67.     Trex's acts and omissions in violation of Magnuson-Moss are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful.  15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

68.     Plaintiffs and the class members they seek to represent have suffered damages as a result of Trex's breaches of warranty and violations of Magnuson-Moss.

69.     Magnuson-Moss provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by the obligations that Magnuson-Moss imposes.  15 U.S.C. § 2310(d)(1).  Plaintiffs and the class they seek to represent ask for a reformation of Trex's warranty documents to comport with Trex's obligations under Magnuson-Moss.  In addition, they ask that Trex be enjoined from acting unlawfully as alleged herein, including with respect to its practices aimed at discouraging consumers who purchased defective Trex product from seeking the full panoply of remedies available to them.

70.     Magnuson-Moss also provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in connection with the commencement and prosecution of lawsuits thereunder, unless the Court in its discretion determines that such an award would be inappropriate.  15 U.S.C. § 2310(d)(2).  Plaintiffs and the prospective class intend to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

## COUNT II

**Breach of Express Warranty and Violations of Article 2 of the Uniform Commercial Code**

71.     Plaintiffs restate the preceding paragraphs and allegations and incorporate them here by this reference.

72.     Where adopted, Article 2 of the Uniform Commercial Code (sometimes "UCC") governs transactions in goods and warranty rights and obligations.

73.     Trex extends an express written warranty directly to consumers.  It warrants that for a period of 25 years, "*Trex products shall be free from material defects in workmanship and*

*materials*, and shall not check, split, splinter, rot or suffer structural damage from termites or fungal decay." (Emphasis added.) In fact, however, the Trex products purchased by the plaintiffs were not free from material defects in workmanship and materials.

74. Trex also extended express warranties to consumers, including plaintiffs, by way of product descriptions and representations as to product qualities and characteristics made in sales literature at retailers, on its website, and via advertisements, among other methods, as set forth above. *E.g.*, RCW 62A.2-313(1) (law of plaintiff Hathaway's home state of Washington). In addition, Trex extended express warranties to consumers by way of displaying product samples at retailers that showed no signs of the defect that would plague consumers' purchases. *Id.*

75. In its written warranty document, Trex purports to exclude or disclaim liability and remedies for consequential and incidental damages a) generically, by way of references to "special, incidental or consequential damages"; b) specifically, by way of references to removal and installation labor costs and freight charge; and c) implicitly, by purporting to provide only for replacement or refund, at its option, relative to defective goods. At the time Trex extended its express warranties, however, Trex knew that it was experiencing grave manufacturing issues and that its products were defective, yet it continued to place defective product on the market and to make representations to consumers that the product was anything but defective. Thus, its exclusions and limitations are unconscionable because they purport to curtail liability and remedies relative to a defect known but not disclosed. Moreover, these purported exclusions or disclaimers of liability and remedies were never negotiated between Trex, a powerful corporation with immense bargaining power on the one hand, and on the other, the plaintiff consumers. And critically, plaintiffs did not see these purported exclusions and limitations – which are not conspicuous in the warranty document in any event – until *after* their purchases, if at all. This is typical of the experience of consumers nationwide.

76. Under these circumstances, Trex's purported exclusions or limitations of liability and remedies are unconscionable and invalid. *E.g.*, RCW 62A.2-302(1); RCW 62A.2-719(3) (law of plaintiff Hathaway's home state of Washington).

77.     What is more, the defects in the Trex material sold to plaintiffs were latent and non-discoverable by reasonable inspection at the time plaintiffs purchased the goods.  Furthermore, decking materials are intended to be installed in structures; when these materials fail, any materials meant to replace defective boards must be transported to the place of the structure, and labor is necessary to remove the defective material, to dispose of it, and to replace it with other material.

78.     Here, Trex's purported limitation or exclusion of the partial but necessary remedies of payment or reimbursement for shipping charges, necessary supplies, and the cost of removal and replacement labor causes the purportedly limited remedy set forth in Trex's warranty document to fail of its essential purpose.

79.     Under the facts and circumstances here present, plaintiffs and the class are entitled to the full panoply of remedies provided under Article 2 of the UCC as adopted by the various states, as well as all other applicable remedies.  *See, e.g.*, RCW 62A.2-316(1); RCW 62A.2-714; RCW 62A.2-715; and RCW 62A.2-719(2)-(3) (law of plaintiff Hathaway's home state of Washington)  These include refunds or replacement of the defective decking material with non-defective material of at least the quality and grade marketed and promised, as well as shipment of replacement material to the plaintiffs' homes, the cost of labor to remove the defective material, the cost to dispose of the defective material, and the cost of labor and supplies, including but not limited to fasteners, necessary to install the replacement materials, all at Trex's expense.

80.     The Uniform Commercial Code, including Article 2 on Sales, was meant to harmonize the law governing commercial transactions across the United States.  Every state in the Union has adopted the Uniform Commercial Code, though Louisiana has not adopted Article 2 on Sales.

81.     Trex has marketed its decking material nationwide throughout the proposed class period.  Upon information and belief, Trex has behaved similarly in its dealings with, and has proffered similar warranty documents long after sales have occurred to, consumers across the United States who have complained about defective goods and Trex's breaches of warranty.  Accordingly, not only does Washington's Article 2 apply as indicated, but the corresponding

provisions of Article 2 of the UCC apply with respect to the claims of other plaintiffs and putative

class members in the 48 other states (and the District of Columbia) where they have been adopted.

82.     Applicable sections of Washington's Article 2 are cited above.  Companion

codifications of Article 2 of the UCC are found as follows:

            a.     Ala. Code § 7-2-101, *et seq.*

            b.     Alaska Stat. § 45.02.101, *et seq.*

            c.     Ariz. Rev. Stat. § 47-2101, *et seq.*;

            d.     Ark. Code § 4-1-2, *et seq.*;

            e.     Cal. Com. Code § 2101, *et seq.*;

            f.     Colo. Rev. Stat. § 4-3-101, *et seq.*;

            g.     Conn. Gen. Stat. § 42a-2-101, *et seq.*;

            h.     6 Del. Code § 2-101, *et seq.*;

            i.     D.C. Code § 28:2-101, *et seq.*;

            j.     Fla. Stat. § 672.101, *et seq.*;

            k.     Ga. Code § 11-2-101, *et seq.*;

            l.     Haw. Rev. Stat. § 490:2-101, *et seq.*;

            m.     Idaho Code § 28-2-101, *et seq.*;

            n.     810 Ill. Comp. Stat. § 5/2-101, *et seq.*;

            o.     Ind. Code Ann. § 26-1-2-101, *et seq.*;

            p.     Iowa Code § 554.2101, *et seq.*;

             q.     Kan. Stat. § 84-2-101, *et seq.*;

            r.     Ky. Rev. Stat. § 355.02.101, *et seq.*;

            s.     Me. Rev. Stat. § 11. 2-101, *et seq.*;

            t.     Md. Com. Law Code § 2-101, *et seq.*;

            u.     Mass. Gen. Laws 106:2-101, *et seq.*;

            v.     Mich. Stat. § 440.2101, *et seq.*;

            w.     Minn. Stat. § 336.2-101, *et seq.*;

            x.     Miss. Code Ann. § 75-2-101, *et seq.*;

1    y.    Vernon's Mo. Rev. Stat. § 400.2-101, *et seq.*;

2    z.    Mont. Code Ann. § 30-2-101, *et seq.*;

3    aa.   Neb. Rev. Stat. § UCC-2-101, *et seq.*;

4    bb.   Nev. Rev. Stat. § 104.2101, *et seq.*;

5    cc.   N.H. Rev. Stat. § 382-A:2-101, *et seq.*;

6    dd.   N.J. Stat. Ann. § 12A:2-101, *et seq.*;

7    ee.   N.M. Stat. Ann. § 55-2-101, *et seq.*;

8    ff.   N.Y. Gen. Bus. Law § UCC-2-101, *et seq.*;

9    gg.   N.C. Gen. Stat. § 25-2-101, *et seq.*;

10   hh.   N.D. Cent. Code § 41-02-01, *et seq.*;

11   ii.   Ohio Rev. Stat. § 1302.01, *et seq.*;

12   jj.   Okla. Stat. tit. § 12A-2-101, *et seq.*;

13   kk.   Or. Rev. Stat. § 72.1010, *et seq.*;

14   ll.   13 Pa. Consol. Stat. § 2101, *et seq.*;

15   mm.   R.I. Gen. Laws. § 6A-2-101, *et seq.*;

16   nn.   S.C. Code Laws § 36-2-101, *et seq.*;

17   oo.   S.D. Code Laws § 57A-2-101, *et seq.*;

18   pp.   Tenn. Code § 47-2-101, *et seq.*;

19   qq.   Tex. Bus. & Com. Code § 2.102, *et seq.*;

20   rr.   Utah Code Ann. § 70A-2-101, *et seq.*;

21   ss.   Vt. Stat. Ann. tit. 9A, § 2-101, *et seq.*;

22   qq.   Va. Code Ann. § 8.2-101, *et seq.*;

23   uu.   W. Va. Code § 46-2-101, *et seq.*;

24   vv.   Wis. Stat. § 402.101, *et seq.*; and

25   ww.   Wyo. Stat. § 34.1-2-101, *et seq.*

26   As to the claims of Louisiana residents, the Civil Code and case law of that state applies.

27

28

FIRST CONSOLIDATED CLASS ACTION COMPLAINT          - 23 -
CV 09-00670 JF
010095-13  404945 v1

**COUNT III**

**Breach Of The Implied Warranty Of Merchantability**

(On Behalf of Residents of the States of Alaska, Arkansas, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming)

83.     Plaintiffs restate the preceding paragraphs and allegations and incorporate them here by this reference.

84.     Trex is a merchant as defined by applicable UCC provisions and sold Trex decking products to plaintiffs and the proposed class for residential use.

85.     Trex impliedly warranted to plaintiffs and the class that Trex decking was free of defects, that it was merchantable, and that it was fit the ordinary purpose for which such goods are used, including for residential use. *See*, *e.g.*, RCW 62A.2-314 (setting forth the UCC's implied warranty of merchantability).

86.     Though privity is not required under the law of the referenced states, plaintiffs and the class were in privity with Trex in that they purchased their Trex product from an actual or apparent agent of Trex such as Trex's authorized dealers.

87.     Though privity is not required under the law of the referenced states, plaintiffs and the class were and are also in privity with Trex by virtue of the contractual relationship stemming from Trex's manufacturer's warranty sometimes provided in conjunction with the purchase of Trex decking product, which is enforceable by plaintiffs and the class as against Trex, regardless of where, or from whom, the Trex product was acquired.

88.     As alleged herein, Trex's sales of its decking product breached the implied warranty of merchantability because the product is defective, unmerchantable, and not fit for the ordinary purpose for which such goods are used.  The product develops extensive and unsolvable dark spotting/mold and discoloration due to the defect or defects that plague it.  It also is not low maintenance, such that it does not conform to promises or affirmations made, including by way of

point-of-purchase advertising and representations and the samples available at retailers for inspection.

89.     Trex's conduct in selling and marketing a defective product that develops extensive and unsolvable fungal growth, mold spotting, and discoloration, along with Trex's failure to disclose to the plaintiffs and the class the existence of the defect, is a breach of Trex's obligation of good faith and fair dealing.

90.     Trex knew or should have known that its product had the aforesaid properties and was defective, unmerchantable, and unfit for its intended use or purpose.

91.     Trex has had reasonable and adequate notice of plaintiffs' and the class's claims for breach of implied warranty of merchantability, and it has failed to cure.

92.     Trex's purported disclaimers or exclusions of the implied warranty of merchantability in certain versions of its written warranty are invalid, void, and unenforceable per Magnuson-Moss, 15 U.S.C. § 2308(a)(1) and per the court-approved and ordered settlement in *Kanefsky v. Trex Company, Inc.*, referenced above.

93.     As a result of Trex's breaches of the implied warranty of merchantability, plaintiffs and members of the prospective class who reside in the states of Alaska, Arkansas, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming have been injured and are entitled to the full panoply of remedies provided under Article 2 of the UCC as adopted by the various states, as well as all other applicable remedies.  *See, e.g.*, RCW 62A.2-714; RCW 62A.2-715; and RCW 62A.2-719(2)-(3) (law of plaintiff Hathaway's home state of Washington).  These include refunds or replacement of the defective decking material with non-defective material of at least the quality and grade marketed and promised, as well as shipment of replacement material to the plaintiffs' homes, the cost of labor to remove the defective material, the cost to dispose of the defective material, and the cost of labor and supplies, including but not limited to fasteners, necessary to install the replacement materials, all at Trex's expense.

94.     Class members who are residents of the state of Louisiana are entitled to the same relief for Trex's breaches of its implied warranty per the law of that state.

## COUNT IV

### Violation of Consumer Protection Statutes

95.     Plaintiffs restate the preceding paragraphs and allegations and incorporate them here by this reference.

96.     Trex's conduct, including misrepresentations and omissions, as alleged in this complaint, constitute unfair or deceptive or unconscionable acts or practices in violation of the consumer protection acts (this term is used broadly) of the various states.  Such behavior is unlawful.  Trex's continuing violations of law include, but are not limited to:

        a.     Placing on the market decking materials that were known to be defective, or that were known as likely to be defective, while representing that those products were free from material defects;

        b.     Marketing, promoting, and advertising its products as having uses, characteristics, or benefits that they did not have, and as being of a certain standard, quality, or grade, when really they were of another;

        c.     Concealing defects in, and true characteristics of, its products;

        d.     Promoting its products as superior to alternatives, including natural lumber alternatives, and charging higher prices for its products, while knowing that in fact they was not superior to alternatives such as natural lumber;

        e.     Failing to negotiate exclusions, disclaimers, and limitations of liability and remedies, which were and are unconscionable under the facts and circumstances, and then inserting them into warranty documents anyway;

        f.     Sending the warranty documents referenced in the preceding subparagraph e, with the purported disclaimers, limitations, and exclusions, to consumers who reported that their Trex product had exhibited defects, in an effort to induce those consumers to forego rights and remedies rightfully available to them, including the right to be reimbursed for the cost of labor necessary to remove defective Trex decking and to install replacement decking;

g.     Failing to make conspicuous in its warranty documents the purported disclaimers, limitations, and exclusions referenced in the preceding subparagraph e;

h.     Failing to make warranty documents available to consumers at or around the time of their purchase of Trex products;

i.     Failing to process consumer complaints in a timely fashion; and

j.     Systematically discouraging consumers from availing themselves of their lawful rights to seek full redress related to their purchases of defective Trex decking materials.

97.     Trex willfully engaged in such practices knowing them to be unfair or deceptive, or unconscionable, and with the intent that plaintiffs and the prospective class would act or fail to act in manners designed to advance Trex's commercial interests.

98.     The wrongful conduct alleged in this complaint occurred, and continues to occur, in the ordinary course of Trex's business or occupation and has caused great harm to plaintiffs and the prospective class, who were foreseeable and direct victims thereof.

99.     Trex has injured the public interest, and Trex's actions continue to pose a threat to the public.

100.     As a direct and legal result of Trex's misleading, deceptive, unfair, false, fraudulent, and unconscionable trade practices, plaintiffs and the prospective class have sustained damages in amounts to be proven at trial.

101.     As examples of Trex's violation of state consumer protection laws: Trex has violated California's Consumer Legal Remedies Act ("CLRA") by uniformly and affirmatively misrepresenting to plaintiff Mahan and California class members that Trex decking material is "low maintenance" when it is not.  Specifically, Trex's uniform misrepresentation of these material facts has violated:

§ 1770(a)(5)'s proscription against representing that goods have uses or characteristics they do not actually have;

§ 1770(a)(7)'s proscription against representing that goods are of a particular standard or quality when they are of another;

§ 1770(a)(9)'s proscription against advertising goods with the intent not to sell them as advertised; and

102.    Trex violated the CLRA's "proscription against a concealment of the characteristics, use, benefit, or quality" of Trex decking material by actively concealing in all of its broadly disseminated advertising, warranties, and representations the material fact that the decks suffer from the mold spotting defect and are therefore substantially certain to fail prematurely. *Outboard Marine Corp. v. Superior Ct.*, 52 Cal. App. 3d 30, 37, 124 Cal. Rptr. 852 (1979). Specifically, Trex's active concealment of material facts violated:

§ 1770(a)(5)'s proscription against representing that goods have uses or characteristics they do not actually have;

§ 1770(a)(7)'s proscription against representing that goods are of a particular standard or quality when they are of another;

§ 1770(a)(9)'s proscription against advertising goods with the intent not to sell them as advertised; and

103.    The facts misrepresented and concealed by Trex were material, in that a reasonable person would have considered them important in deciding whether or not to purchase (or to pay the same price for) the Trex decking and railing material.

104.    Trex's misrepresentations, concealment, and deceptive practices, in violation of the CLRA, were designed to induce Plaintiff Mahan and California class members to purchase the decking and railing material.

105.    Trex intended to do the act that was deceptive and/or fraudulent, namely, to market, distribute and sell the defective decking and railing material.

106.    Plaintiff Mahan and California members of the proposed class suffered actual damages as a direct result of Trex's misrepresentations, concealment, and/or omissions in violation of the CLRA, as evidenced by their decisions to purchase defective Trex decking products. Had they known of the true character and quality of the Trex decking products, plaintiff Mahan and the California class members would not have purchased (or would have paid less for) the products.

107. To this day, Trex continues to violate the CLRA by concealing the defective nature of its decking products and continuing to sell these products, by selling (and profiting unjustly from) replacement decking material, and by failing or refusing to reveal to California class members that the cause of the problems with the decking products is an inherent defect and not a result of improper use or maintenance.

108. Trex also violated § 1770(a)(19)'s proscription against inserting unconscionable provisions in contracts for the sale of goods to consumers, by inserting clauses in its warranty that purport to (a) exclude coverage for damage caused by the hidden and latent defect, and (b) limit consequential damages for all warranty claims. These provisions are unconscionable.

109. Plaintiff Mahan, on behalf of himself and all others similarly situated, demands judgment against Trex under the CLRA for injunctive relief in the form of restitution and/or proportional disgorgement of funds paid to Trex to purchase defective decking products and/or replace the defective products, an injunction requiring Trex to replace the defective decking products free of charge, and an award of attorneys' fees.

110. In accordance with § 1782(a) of the CLRA, on January 15, 2010, plaintiffs' counsel served Trex with notice of its alleged violations of the CLRA by certified mail, return receipt requested. A true and correct copy of that notice is attached hereto as Exhibit 14.

111. Trex failed to provide appropriate relief for its violations of the CLRA within 30 days of plaintiff's January 15, 2010 notification; therefore, plaintiff Mahan seeks damages pursuant to Cal. Civ. Code §§ 1780, 1782, for himself and California members of the proposed class, including:

actual damages, § 1780(a)(1);

punitive damages, § 1780(a)(4);

penalties of up to $5,000 for each senior citizen Class member, § 1780(b);

attorneys' fees and costs, § 1780(e); and

any other relief the Court deems proper, § 1780(a)(5).

112. By way of another example of relief available to plaintiffs, California Business & Professions Code § 17200 prohibits acts of "unfair competition." As used here, "unfair

competition" encompasses three distinct types of misconduct: (a) "unlawful…business acts of practices;" (b) "unfair or fraudulent business acts of practices;" and (c) "unfair, deceptive or misleading advertising."

113.    Trex violated the Unfair Business Practices Act, Business and Professions Code §§ 17200 and 17500, *et seq.*, by engaging in conduct that violated each of the three prongs identified by the statute and outlined in Paragraph 120, above.

114.    Trex committed an unlawful business act or practice in violation of Sec. 17200, *et seq.*, when it violated Cal. Civ. Code § 1710 as alleged in the First Claim for Relief, above.

115.    Trex committed an unlawful business act or practice in violation of § 17200, *et seq.*, when it violated the CLRA as alleged in the Second Claim for Relief, above.

116.    Trex committed an unlawful business act or practice in violation of § 17200, *et seq.*, when it violated the common law prohibition against deceit/fraud as alleged in the First Claim for Relief.

117.    Trex committed an unlawful business act or practice in violation of § 17200, *et seq.*, when it violated the common law prohibition against fraudulent misrepresentations and fraudulent concealment/nondisclosure.

118.    Trex committed unfair and fraudulent business acts and practices in violation of §§ 17200 and 17500, *et seq.*, by actively concealing and omitting from its advertising, marketing, and other communications (including, inter alia, concealments and omissions in Trex's communications with wholesalers, retailers, and others in the chain of distribution that were ultimately passed on to plaintiff Mahan and California members of the proposed class) material information about the defective nature of Trex decking products in a manner that is deceptive and likely to deceive consumers and the public.  Trex was in a position of superior knowledge of the material defect and failed to disclose it or concealed it from the consuming public, and in fact, made misrepresentations that the product was "low maintenance," when it is not.  Trex thereby had an affirmative duty to disclose the true nature of the product and the defect.

119.    Trex disseminated unfair, deceptive, untrue and/or misleading advertising in violation of §§ 17200 and 17500, *et seq.*, when it concealed and/or failed to disclose the true

defective nature of its decking products in its advertising, marketing, and other broadly disseminated representations containing statements that its decking products were of a certain quality or standard when they were not.

120.     Trex disseminated unfair, deceptive, untrue and/or misleading advertising in violation of §§ 17200 and 17500, *et seq.*, when it stated in its marketing, advertising and other broadly disseminated representations that Trex decking products were low maintenance when, in fact, they are not.  These misrepresentations are likely to deceive the public.

121.     Trex's deceptive practices were specifically designed to and did induce plaintiff and members of the Class to purchase Trex decking products.

122.     Trex's deceptive practices have deceived and/or are likely to deceive plaintiff and members of the consuming public.

123.     To this day, Trex continues to violate the Unfair Business Practices Act by continuing to actively misrepresent and conceal the true characteristics of its decking products.

124.     As a direct and proximate cause of Trex's violation of the Unfair Business Practices Act,  plaintiff Mahan and other California members of the proposed class have suffered harm in that they own defective decking products substantially certain to prematurely fail, and will be required to incur costs to clean and/or replace the defective decks.

125.     As a proximate result of Trex's violation of the Business and Professions Code § 17200, *et seq.*, Trex has been unjustly enriched and should be required to make restitution to plaintiff Mahan and California members of the proposed class to disgorge its ill-gotten profits pursuant to § 17203 of the Business & Professions Code.

126.     Plaintiff Mahan, on behalf of himself and California members of the proposed class, is entitled to injunctive relief in the form of restitution, proportional disgorgement of funds paid to Trex to purchase the defective decking products, disgorgement of funds received by Trex from the purchase of replacement decking material, and/or injunctive relief in the form of replacement of the defective decks.

127.     As a further example of the relief available to plaintiffs, Washington's Consumer Protection Act provides that an injured party may have damages; injunctive relief; treble damages

to $25,000; and the costs of suit, including a reasonable attorney's fee. RCW 19.86.090. Plaintiff Hathaway, who purchased his defective decking material in Washington, seeks all damages lawfully recoverable as they relate to his purchase of defective Trex decking material, to include but not be limited to, the cost of labor to remove the defective material and also to replace it with replacement material, together with any necessary supplies, which cost Trex has refused to pay, with trebling. He also seeks injunctive relief to enjoin further violations of law. And he seeks the costs of suit, including a reasonable attorney's fee.

128. Trex's actions and omissions as described in this complaint also have violated the consumer protection statutes of various other states, where Trex has behaved similarly with regard to consumers who reside in those states. These actions and omissions, which have included intentional, unconscionable, and repeated deception, false promise, misrepresentation, and/or concealment, suppression, or omission of material fact, among other unconscionable behaviors, including unfair trade practices, have affected the public interest in those various states. Members of the prospective class seek the full measure of relief available at law and equity (to include or be constituted by injunctive and declaratory relief as available) under the laws of those various states, including actual damages and multiplication of actual damages as allowed by law, or restitution or disgorgement, and punitive damages where available, together with the cost of suit, including reasonable attorneys' fees. In this proposed nationwide class action, the state laws under which the prospective class seeks relief include:

a. Ariz. Rev. Stat. § 44-1522, *et seq.*;

b. Ark. Code § 4-88-101, *et seq.*;

c. Cal. Bus. & Prof. Code §§ 17200 and 17500, *et seq.*;
   Cal. Civ. Code § 1750, *et seq.*;

d. Colo. Rev. Stat. § 6-1-101, *et seq.*;

e. Conn. Gen. Stat. § 42-110a, *et seq.*;

f. 6 Del. Code § 2511, *et seq.*;

g. D.C. Code § 28-3901, *et seq.*;

h. Fla. Stat. § 501.201, *et seq.*;

1          i.      O.C.G.A. § 10-1-372, *et seq.*;

2          j.      Haw. Rev. Stat. § 480, *et seq.*;

3          k.      Idaho Code § 48-601, *et seq.*;

4          l.      815 ILCS § 505/1, *et seq.*;

5              815 ILCS § 510/1, *et seq.*;

6          m.      Kan. Stat. § 50-626, *et seq.*;

7          n.      Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

8              Ky. Rev. Stat. Ann. § 365.020, *et seq.*;

9          o.      5 Me. Rev. Stat. § 205A, *et seq.*;

10         Me. Rev. Stat. Ann. 10, § 1211, *et seq.*;

11        p.      Md. Com. Law Code § 13-101, *et seq.*;

12        q.      Mass. Ann. Laws ch. 93A, *et seq.*;

13        r.      Mich. Stat. § 445.901, *et seq.*;

14        s.      Minn. Stat. § 325F.68, *et seq.*;

15          Minn. Stat. § 325D.45, *et seq.*;

16        t.      Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

17        u.      Neb. Rev. Stat. § 59-1601, *et seq.*;

18          Neb. Rev. Stat. § 87-301, *et seq.*;

19        v.      Nev. Rev. Stat. § 598.0903, *et seq.*;

20        w.      N.C. Gen. Stat. § 75-1.1, *et seq.*;

21        x.      N.H. Rev. Stat. § 358-A:1, *et seq.*;

22        y.      N.J. Stat. Ann. § 56:8-1, *et seq.*;

23        z.      N.M. Stat. Ann. § 57-12-1, *et seq.*;

24        aa.      N.Y. Gen. Bus. Law § 349, *et seq.*;

25        bb.      N.D. Cent. Code § 51-15-01, *et seq.*;

26        cc.      Ohio Rev. Stat. § 1345.01, *et seq.*

27                 (by way of violation of Ohio Admin. Code 109:4-3-10(A));

28          Ohio Rev. Stat. § 4165.01, *et seq.*;

| | dd. | Okla. Stat. tit. 15 § 751, *et seq.*; |
|---|---|---|
| | ee. | Or. Rev. Stat. § 646.605, *et seq.*; |
| | ff. | R.I. Gen. Laws. § 6-13.1-1, *et seq.*; |
| | gg. | S.C. Code Laws § 39-5-10, *et seq.*; |
| | hh. | S.D. Code Laws § 37-24-1, *et seq.*; |
| | ii. | Tex. Bus. & Com. Code §§ 17.41-17.63; |
| | jj. | Vt. Stat. Ann. tit. 9, § 2451, *et seq.*; |
| | kk. | RCW 19.86.010, *et seq.*; |
| | ll. | West Virginia Code §46A-6-101, *et seq.*; and |
| | mm. | Wis. Stat. § 100.18, *et seq.* |

## COUNT V

### Fraudulent Concealment/Nondisclosure

129.    Plaintiffs restate the preceding paragraphs and allegations and incorporate them here by this reference.

130.    Trex knew that its decking products were and are defective in that they are substantially certain to exhibit the dark spotting/mold defect complained of herein.  Upon information and belief, Trex has received at least hundreds of complaints regarding the dark spotting complained of herein from customers alerting Trex to the defect or defects in its products.

131.    Despite its knowledge of the defect or defects, Trex fraudulently concealed from and/or intentionally failed to disclose to plaintiffs, members of the prospective class, and all others in the chain of distribution (*e.g.,* concealments and omissions in Trex's communications with wholesalers, retailers, and others in the chain of distribution that ultimately were passed on to plaintiffs and the class) the true nature of its decking products.

132.    Trex was and is under a duty to plaintiffs and the classes to disclose these facts because:

133.    Trex is in a superior position to know the true character and quality of its defective decking products, and the dark spotting/mold defect is latent;

134.    Trex makes partial disclosures about the defective decking products while not revealing their true character or quality; and

135.    Trex actively concealed the nature of the defective decking products from plaintiffs and the prospective class.

136.    The facts concealed and/or not disclosed by Trex to plaintiffs and the class are material facts, in that a reasonable person would have considered them important in deciding whether or not to purchase (or to pay the same price for) the Trex decking products.

137.    Trex intentionally concealed and/or failed to disclose the problems with its decking products for the purpose of inducing plaintiffs and class members to act thereon.

138.    Plaintiffs and class members justifiably acted or relied upon to their detriment—as would any reasonable person or consumer—the concealed and/or non-disclosed material facts as evidenced by their purchase of the defective decking products.  The decking products require more (albeit futile) maintenance than a reasonable consumer would expect, and the dark spotting/mold spots are impossible to prevent or remove, and they return shortly after cleanings.  Had they known of the true character and quality of Trex's decking products, plaintiffs and class members would not have purchased (or would have paid less for) the decking products.

139.    As a direct and proximate cause of Trex's misconduct, plaintiffs and class members have suffered actual damages in that they have defective decking products that have required or will require unreasonable, time-consuming, expensive, excessive, and futile maintenance, necessitating replacement.

140.    Trex's conduct has been and is malicious, wanton, and/or reckless and/or shows a reckless indifference to the interests and rights of others, including plaintiffs and the class.

141.    Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Trex for refunds and actual damages and other relief as requested herein, plus attorneys' fees for the establishment of a common fund, interest, costs, and punitive damages.

**COUNT VI**

**Fraudulent Misrepresentation**

142.    Plaintiffs restate the preceding paragraphs and allegations and incorporate them here by this reference.

143.    Trex knowingly and/or recklessly made uniform misrepresentations to consumers, including plaintiffs and members of the prospective class, that Trex decking products were low maintenance when, in fact, they were and are not.

144.    Trex knew or was reckless in not knowing that its representations were untrue.  Trex either had actual knowledge of the fact that its decking products were not low maintenance, and instead required an unreasonable amount of cleaning resulting from the dark spotting/mold defect, or it was reckless in not knowing.

145.    Trex intended for consumers to rely on its representations regarding the amount of effort and expense required to maintain the product.  Trex knew that its representations regarding the lack of maintenance required, and the lack of resulting expense of maintenance, would induce consumers to buy its products, even at a premium over wood products.

146.    Plaintiffs and class members were unaware of the fact that Trex decking products were not low maintenance and would require more cleaning, albeit futile cleaning, than a consumer would expect even of a wood deck, and that even then, the product would continue to exhibit unsightly dark spotting/mold stains.

147.    Plaintiffs and the class reasonably relied on Trex's misrepresentations regarding the amount of maintenance required, as would any reasonable person or consumer.

148.    The fact that Trex was advertised as a low maintenance product was a primary selling point of Trex decking.  Had Plaintiffs and class members known that the Trex decking products were, in fact, high maintenance, and more maintenance-intensive than a less expensive wood deck, they would have paid less for them, purchased a different product, or purchased no such product at all.

149. Plaintiffs and the class have been proximately damaged as a result of their reliance on Trex's misrepresentations in that they purchased Trex decking products that are defective and require frequent, difficult, time-consuming, and expensive maintenance, and even then, the maintenance is not effective to correct the dark spotting/mold defect.

150. Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Trex for refunds and actual damages and other relief as requested herein, plus attorneys' fees for the establishment of a common fund, interest, costs, and punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, having stated the foregoing allegations and claims, plaintiffs pray:

A. That the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to their and the prospective class's claims for equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to their and the prospective class's claims for damages, and declaring them representatives of the class and their counsel as counsel for the class;

B. That the conduct alleged herein be declared, adjudged, and decreed to be unlawful, including pursuant to Magnuson-Moss;

C. That the Trex warranty documents be re-formed as necessary, or that certain provisions therein be disregarded as invalid or unenforceable, to permit them and the class the full panoply of remedies available to them for breach of express and implied warranties or contract under Article 2 of the Uniform Commercial Code (or the applicable provisions of the Civil Code of Louisiana, as appropriate) as adopted in their respective states, or otherwise, including pursuant to Magnuson-Moss;

D. That they and the class be afforded all remedies available to them at law or equity, including but not limited to: awards of damages, declaratory relief as appropriate, replacement of defective decking material with non-defective material of suitable type and class, restitution, or disgorgement under the consumer protection laws of the various states, as applicable, in such amounts to be determined at trial, with punitive damages, treble or other multiple damages, or penalties where permitted by law;

FIRST CONSOLIDATED CLASS ACTION COMPLAINT
CV 09-00670 JF
010095-13 404945 v1

- 37 -

E.      That they and the class be granted an award of punitive damages as otherwise available at law or equity, and in an amount to be determined at trial;

F.      That Trex be enjoined from continuing the illegal activities alleged herein, and that a permanent injunction issue requiring Trex to perform as requested herein, including pursuant to Magnuson-Moss;

G.      That they and the class recover their costs of suit, including reasonable attorneys' fees and expenses, to include expert witness fees, as provided by law, including Magnuson-Moss;

H.      That they be permitted leave to amend their complaint as necessary, including to conform to evidence produced at trial;

and

I.      That they and the class be granted such other, further, and different relief as the nature of the case may require, or as may be determined to be just, equitable, and proper by this Court.

## DEMAND FOR JURY

Plaintiffs and the prospective class respectfully demand a jury trial on all issues so triable.

DATED:  October 29, 2010.

HAGENS BERMAN SOBOL SHAPIRO LLP


By _____ s/ Steve W. Berman _____
    Steve W. Berman (*pro hac vice*)
    Robert F. Lopez, (*pro hac vice*)
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile:   (206) 623-0594

HAGENS BERMAN SOBOL SHAPIRO LLP


By _____s/ Jeff D. Friedman_____
Jeff D. Friedman (173886)
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001

*Attorneys for Plaintiffs Silverman, Schauppner,*
*Zachwieja, and Shapiro, and Lead Counsel for*
*the Proposed Class*

.

Jonathan D. Selbin (State Bar No. 170222)
jselbin@lchb.com
Nimish R. Desai (State Bar No. 244953)
ndesai@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Elizabeth A. Alexander (*pro hac vice*)
ealexander@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219-2423
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

Kim D. Stephens
TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101-4416
Telephone: (206) 682-5600
Facsimile: (206) 682-2992

Robert D. Gary (*pro hac vice*)
Jori Bloom Naegele (*pro hac vice*)
GARY, NAEGELE & THEADO, LLC
446 Broadway Avenue
Lorain, OH 44052
Telephone: (440) 244-4809
Facsimile: (440) 244-3462

1    Richard S. Lewis (*pro hac vice*)
     James J. Pizzirusso (*pro hac vice*)
2    HAUSFELD LLP
     1700 K Street, NW, Suite 650
3    Washington, DC 20006
     Telephone:  (202) 540-7200
4    Facsimile:   (202) 540-7201

5    Michael McShane
     AUDET & PARTNERS, LLP
6    221 Main Street, Suite 1460
     San Francisco, CA 94105
7    Telephone:  (415)-568-2555
     Facsimile:  (415)-568-2556
8

9    Robert K. Shelquist
     LOCKRIDGE GRINDAL NAUEN P.L.L.P.
10   100 Washington Avenue South, Suite 200
     Minneapolis, MN 55401-2197
11   Telephone:  (612)-339-6900
     Facsimile:  (612)-339-0981
12

13   Charles L. LaDuca
     CUNEO, GILBERT & LADUCA, LLP
14   507 C Street, NE
     Washington, DC 20002
15   Telephone:  (202)-789-3960
     Facsimile:  (202)-789-1813

16   *Attorneys for Plaintiffs Mahan, Tisdale, McKenna, Forcella,*
     *Hass, Biondi-Huffman, Hathaway, and the Proposed Class*
17

18

19

20

21

22

23

24

25

26

27

28