1

Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)

2

HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300

3

Seattle, Washington 98101
Telephone: (206) 623-7292

4

Facsimile: (206) 623-0594

5

*Counsel for Select Plaintiffs and Lead Counsel for the Proposed Class*

6

7

UNITED STATES DISTRICT COURT

8

NORTHERN DISTRICT OF CALIFORNIA

9

10

DEAN MAHAN, GRETCHEN SILVERMAN,
STEVEN MCKENNA, THOMAS
SCHAUPPNER, MARJORIE ZACHWIEJA,

11

JOHN FORCELLA, SHEILA SHAPIRO,
SABRINA W. HASS and DR. LANNY W.

12

HASS, AMY BIONDI-HUFFMAN, and BRIAN
HATHAWAY, on behalf of themselves and all

13

others similarly situated,

14

Plaintiffs,

15

v.

16

TREX COMPANY, INC.,

17

Defendant.

No. 5:09-CV-00670-JSW

NOTICE OF MOTION AND MOTION
FOR PRELIMINARY APPROVAL OF
CLASS SETTLEMENT, PROVISIONAL
CERTIFICATION OF SETTLEMENT
CLASS, AND APPOINTMENT OF
CLASS REPRESENTATIVES AND
CLASS COUNSEL

Date:   May 31, 2013
Time:   9:00 a.m.
Judge:  Honorable Jeffrey S. White
Dept.:  Department 11, 19th Floor

18

19

20

21

22

23

24

25

26

27

28

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on May 31, 2013, at 9:00 a.m., or as soon thereafter as may be heard in the courtroom of the Honorable Jeffrey S. White, United States District Court for the Northern District of California, San Francisco Division, plaintiffs Dean Mahan, Gretchen Silverman, Steven McKenna, Thomas Schauppner, Marjorie Zachwieja, John Forcella, Sheila Shapiro, Sabrina W. Hass and Dr. Lanny W. Hass, Amy Biondi-Huffman, and Brian Hathaway will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 23(e), for an order:

1. Preliminarily approving the settlement they have reached on a class-wide basis with defendant Trex Company, Inc.

2. Granting provisional approval of the settlement class, and appointing the foregoing named plaintiffs as class representatives and Hagens Berman Sobol Shapiro LLP as class counsel;

3. Directing notice of the proposed settlement to the class; and

4. Setting a schedule for the final approval process.

The grounds for this motion are that the proposed settlement is fair, adequate, and reasonable, and that the other requested relief is well-grounded in law and fact, as set forth in the attached memorandum.  This motion is based on the declarations submitted herewith, with exhibits; the attached memorandum in support of plaintiffs' motion; the pleadings and papers on file in this action; and the oral argument of counsel, if any, presented at the hearing on this motion.

Dated: April 5, 2013.

HAGENS BERMAN SOBOL SHAPIRO LLP


By ___ */s/ Steve W. Berman* _____
      Steve W. Berman
Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

1

2

[Additional signatures at the end of the attached memorandum, which are incorporated here by this reference]

3

4

*Lead Counsel for the Proposed Class and Attorneys for Gretchen Silverman, Thomas Schauppner, Marjorie Zachwieja, and Sheila Shapiro*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF ARGUMENT ................................................................................. 1

II.     STATEMENT OF ISSUES TO BE DECIDED ................................................... 2

III.    STATEMENT OF RELEVANT FACTS ............................................................... 2

        A.      Substantive and Procedural Facts ............................................................. 2

        B.      The Settlement ............................................................................................. 4

                1.      Class definition, class period, and claims period ......................... 4

                2.      Three tiers of class relief ............................................................... 5

                        a.      Tier 1 relief ......................................................................... 5

                        b.      Tier 2 relief ......................................................................... 6

                        c.      Tier 3 relief ......................................................................... 6

                                (1)     Tier 3 relief, first alternative ................................ 7

                                (2)     Tier 3 relief, second alternative ........................... 8

                3.      Rights of appeal ............................................................................. 8

                4.      Cost cap ........................................................................................... 8

                5.      Notice and release .......................................................................... 9

                6.      Service awards and attorneys' fees, costs, and expenses ............ 11

IV.     ARGUMENT ........................................................................................................ 11

        A.      The Court Should Grant Preliminary Approval to the Settlement ........... 11

                1.      Negotiated class-action settlements are desirable. ..................... 12

                2.      The settlement passes the standards for preliminary approval. ...... 12

                        a.      The settlement is the product of well-informed, vigorous, and thorough arms'-length negotiation. ........................... 14

                        b.      The settlement bears no obvious deficiencies. ................ 14

                        c.      The settlement falls within the range of possible approval. ............... 16

        B.      The Proposed Class Should Be Certified for Settlement Purposes ........... 18

                1.      The proposed class meets the *Amchem* requirements for certification of a settlement class. ........................................................................ 18

2.   The Rule 23(a) requirements for numerosity, commonality, typicality, and adequacy are met. ...................................................................... 19

  a.   Numerosity .............................................................................. 19

  b.   Commonality ........................................................................... 19

  c.   Typicality ................................................................................. 20

  d.   Adequacy ................................................................................. 21

3.   Common questions predominate, and a class action is the superior method to adjudicate class members' claims. ................................. 21

  a.   Common questions predominate. ........................................... 22

  b.   Class treatment is the superior method for adjudicating claims of members of the proposed class. ............................................ 22

C.   The Court Should Approve the Proposed Forms and Methods of Class Notice ......... 23

D.   The Court Should Set a Schedule for Toward Final Approval of the Parties' Settlement ............................................................................................... 24

V.   CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

Amchem Prods., Inc. v. Windsor,
521 U.S. 591 (1997) ........................................................................................... 18

Arnold v. Arizona Dep't of Pub. Safety,
2006 U.S. Dist. LEXIS 53315 (D. Ariz. July 31, 2006) ........................................ 13

Barefield v. Chevron U.S.A., Inc.,
1987 WL 65054 (N.D. Cal. Sept. 9, 1987) ........................................................... 20

Browning v. Yahoo! Inc.,
2006 WL 3826714 (N.D. Cal. Dec. 27, 2006) ...................................................... 23

Burden v. SelectQuote Ins. Servs.,
2013 U.S. Dist. LEXIS 41522 (N.D. Cal. Mar. 21, 2013) .............................. passim

Chamberlain v. Ford Motor Co.,
402 F.3d 952 (9th Cir. 2005) ............................................................................... 20

Chavez v. WIS Holding Corp.,
2010 U.S. Dist. LEXIS 56138 (S.D. Cal. June 7, 2010) ....................................... 12

Chin v. RCN Corp.,
2010 U.S. Dist. LEXIS 31272 (S.D.N.Y. Mar. 12, 2010)..................................... 16

Churchill Village, L.L.C. v. General Elec.,
361 F.3d 566 (9th Cir. 2004) ............................................................................... 12

Eisen v. Carlisle & Jacquelin,
417 U.S. 156 (1974) ............................................................................................. 23

Evon v. Law Offices of Sidney Mickell,
688 F.3d 1015 (9th Cir. 2012) ............................................................................. 21

Franklin v. Kaypro Corp.,
884 F.2d 1222 (9th Cir. 1989) ............................................................................. 12

Hanlon v. Chrysler Corp.,
150 F.3d 1011 (9th Cir. 1988) ........................................................................ passim

Immigrant Assistance Project of L.A. Cnty. Fed'n of Labor (AFL-CIO) v. I.N.S.,
306 F.3d 842 (9th Cir. 2002) ............................................................................... 19

In re HP Laser Printer Litig.,
2011 WL 3861703 (C.D. Cal. Aug. 31, 2011) ..................................................... 23

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir. 2010) ................................................................. 25

*In re Pacific Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) .................................................................... 12

*In re Tableware Antitrust Litig.*,
    484 F. Supp. 2d 1078 (N.D. Cal. 2007) ........................................... 13, 23

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    2012 U.S. Dist. LEXIS 149738 (D. Minn. Oct. 18, 2012) ..................... 15

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund. v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir. 2001) ................................................................ 22

*Marilley v. Bonham*,
    2012 U.S. Dist. LEXIS 33678 (N.D. Cal. Mar. 13, 2012) ..................... 20

*Norflet v. John Hancock Life Ins. Co.*,
    658 F. Supp. 2d 350 (D. Conn. 2009) .................................................... 23

*Pelletz v. Weyerhaeuser Corp*,
    592 F. Supp. 2d 1322 (W.D. Wash. 2009) ............................................. 15

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ............................................................................... 23

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) .................................................................. 22

*Van Bronkhorst v. Safeco Corp*.,
    529 F.2d 943 (9th Cir. 1976) .................................................................. 12

*Vasquez v. Coast Valley Roofing, Inc*.,
    670 F. Supp. 2d 1114 (E.D. Cal. 2009) ................................................. 16

### OTHER AUTHORITIES

Alba Conte & Herbert Newberg, *Newberg on Class Actions* (4th ed. 2002) .................... 13, 14, 19

*Manual for Complex Litigation* (4th ed. 2004) ..................................................... *passim*

# I.    SUMMARY OF ARGUMENT

Eleven plaintiffs from around the nation brought this action alleging that defects in defendant Trex Corporation's ("Trex") wood-plastic composite products had manifested in irremediable fungal spotting and discoloration on their decking structures.  Trex denied these allegations, arguing that these problems were caused by environmental or other issues and excluded from coverage by its written warranty.  For years, the parties have litigated this matter vigorously, and now, following intense and lengthy negotiations conducted with the help of a retired federal and state court judge, the Hon. Wayne R. Andersen, the parties have reached a nationwide settlement of plaintiffs' claims.

The parties' settlement provides qualified class members with alternatives among cash, partial cash refunds and reimbursements, and cash-rebate relief.  The cash rebates negotiated in this matter, which are based on the purchase of new-generation decking that is designed to resist mold staining, are set at the rate of 40 or 50 percent of retail purchase price.  These can be worth well over $2,000 on purchases of decking sufficient to build an average-sized structure.  Relative to what class members paid for their original decking, some of which went into structures that now could be well over eight years old, this is a high quantum of relief under any standard.  Moreover, providing cash on each rebate for such a quantity of decking will result in a substantial loss to Trex, not profit from an additional sale.

As plaintiffs demonstrate below, this settlement qualifies for preliminary approval.  Also, this matter qualifies for provisional approval of a settlement class pursuant to Fed. R. Civ. P. 23(b)(3).

As for notice, the parties have agreed to a program that will include direct notification to all complaining consumers of which Trex and plaintiffs' attorneys are aware; a press release; print publication notice; targeted Internet advertising; a settlement website; and an addition to Trex's regular website.  This comprehensive notice program comports with the law and is designed to publicize the benefits that class members can receive from this hard-won settlement.  It also is designed to apprise class members of their opt-out rights and to give them an opportunity to comment on the settlement.  It comports with law, and plaintiffs pray that it be approved.

## II.     STATEMENT OF ISSUES TO BE DECIDED

Should the Court approve the parties' nationwide settlement, which followed comprehensive discovery, expert consultation, litigation, and intense negotiations in which the parties were represented by well-experienced counsel and aided by a respected former federal judge, and which provides to a nationwide class valuable benefits following the implementation of a comprehensive notice program?  Further, should the Court provisionally certify a settlement class so that notice of the settlement may be given to class members; should it appoint the named plaintiffs as class representatives; should it appoint class counsel; and should it set a schedule toward a hearing on whether final approval should be given to the settlement?

## III.     STATEMENT OF RELEVANT FACTS

### A.     Substantive and Procedural Facts

The parties' settlement flows from the consolidation in March 2010 of two actions brought by two sets of plaintiffs.  (Dkt. No. 152.)  At the time of consolidation, the Court appointed Hagens Berman Sobol Shapiro LLP as lead counsel for plaintiffs and the proposed class.  (*Id*.)

Plaintiffs claim that there are defects in Trex's wood-plastic composite decking that have led to fungal spotting/discoloration that will not go away, despite cleaning.  (*See generally* Consol. Am. Compl. (Dkt. No. 175); Declaration of Robert F. Lopez in Support of Plaintiffs' Motion for Preliminary Approval ("Lopez Decl."), ¶ 2.)  They allege that they have been misled by Trex into believing that their decking was a low-maintenance product that would maintain its beauty for years to come.  They also allege that Trex has refused to remedy the issues with their decking.  For their claims for relief, plaintiffs have pled violations of the Magnuson-Moss Warranty Act, breach of express warranty under state laws, breach of implied warranty under state laws, violation of state consumer protection statutes, fraudulent concealment or nondisclosure, and fraudulent misrepresentation.  (*Id*.)  They also have asked that a nationwide class be certified as to their claims, and that they be appointed class representatives.  (*Id*.)

In its answer to plaintiffs' consolidated complaint, Trex has denied all liability to plaintiffs and the putative class.  (*See generally* Trex Ans. (Dkt. No. 182).)  According to Trex, the issues were caused by environmental conditions or improper installation, such that relief was precluded under

1    exclusions in its written warranty.  (*Id.*, ¶¶ 21, 71-94.)  In addition, Trex has denied that any

2    reimbursement for labor expenses was due, owing to a disclaimer in its written warranty of damages

3    for labor specifically and consequential damages more generally.  (*Id.*)

4         Following the Court's[1] entry of scheduling and protective orders at the end of 2010, Dkt.

5    Nos. 188 and 189, the parties exchanged initial disclosures and formal discovery requests, including

6    interrogatories and requests for production.  Trex's production to plaintiffs was substantial,

7    comprising some 17,000 documents, many of a technical nature.  Likewise, plaintiffs' production to

8    Trex was substantial, given that there were 12 plaintiffs at the time.  (There now are 11.)  (Lopez

9    Decl., ¶ 3.)

10        Following review of Trex's initial production, plaintiffs, in consultation with a scientific and

11   industry expert, propounded further discovery to the defendants and to third-parties as well.

12   Following review of this material, plaintiffs, following additional consultation with their expert,

13   deposed two Trex employees, including a company technical representative.  (Lopez Decl., ¶ 4.)

14        Also, as part of its discovery efforts, Trex deposed the plaintiffs near their homes around the

15   country.  Plaintiffs' counsel defended those depositions.  In addition, Trex inspected most of the

16   decks and other Trex structures belonging to the plaintiffs.  (*Id.*, ¶ 5.)

17        As the parties neared the completion of discovery at the end of 2011 and as they approached

18   the scheduled date for plaintiffs to file their motion for class certification, Trex moved to transfer

19   this matter to the Western District of Virginia, where it has its headquarters.  Plaintiffs opposed this

20   motion vigorously, including by way of declarations from almost all of the named plaintiffs.  (*Id.*,

21   ¶ 6.)

22        Shortly after briefing on this motion was complete, the parties broached the possibility of

23   settlement with one another.  While each side was prepared to litigate this matter through class

24   certification and trial, if necessary, and while each believed in the strength of its case, each also

25   recognized the risks inherent to its position in this matter.  (*Id.*, ¶ 7.)

26

27

28         [1] At the time, Judge Fogel presided over the case.

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY APPROVAL  – 5:09-CV-00670-JSW
010095-13 599585 V1

- 3 -

1     Following discussion of initial proposals, the parties decided it would best enable the

2 prospects for settlement if they worked with a proven, well-respected mediator.  Accordingly, the

3 parties engaged the Hon. Wayne R. Andersen (Ret.), who had served formerly as a United States

4 District Judge for the Northern District of Illinois for 19 years and as a state court trial judge for 7

5 years.  (*Id.*, ¶ 8.)

6     Counsel for the parties, who are well-experienced in class-action litigation and with the law

7 and facts at issue in this matter, first met with Judge Andersen in Chicago in March 2012.  While

8 they made some progress toward settlement through vigorous negotiation during this day-long

9 mediation session, they were unable to reach a deal.  They did, however, continue to remain

10 engaged in the process.  (*Id.*, ¶ 9.)

11     After making further progress toward settlement, counsel for the parties again engaged in a

12 second in-person mediation with Judge Andersen in August 2012.  This mediation also took place

13 in Chicago.  Plaintiffs' expert consultant accompanied counsel for the plaintiffs to this mediation;

14 likewise, counsel for Trex brought one of its key technical personnel along, too.  (*Id.*, ¶ 10.)

15     At this second mediation session, the parties again engaged in a vigorous give and take on

16 the issues and on possible class-wide relief.  Following this hard-fought negotiation, and with aid

17 from their technical representatives and the able assistance of Judge Andersen, the parties reached

18 most terms of a nationwide settlement.  But more work remained to be done; a settlement was yet

19 to be reached.  (*Id.*, ¶ 11.)

20     Believing that it was worthwhile to continue to build on the progress made, the parties

21 continued to negotiate, including with the assistance of their technical consultants, and Judge

22 Andersen continued to assist via telephone and in writing as requested.  Finally, the parties

23 concluded their difficult, contentious, but worthwhile efforts toward the fair and reasonable

24 nationwide settlement that plaintiffs now bring to this Court for its review.  (*Id.*, ¶ 12.)

25 **B.     The Settlement**

26     **1.     Class definition, class period, and claims period.**

27     The parties' agreement defines the settlement class as follows:

28

1

> All Persons in the United States or its territories who own or owned a Trex Structure[2] built with Trex Product[3] purchased during the Class Period.  Included within the Settlement Class are the legal representatives, heirs, successors in interest, transferees, and assignees of all such foregoing holders and/or owners, immediate and remote.  Excluded from the Settlement Class are: Defendant and its subsidiaries and affiliates; all Persons who, in accordance with the terms of this Agreement, properly execute and timely file during the Opt-Out Period a request for exclusion from the Settlement Class; all governmental entities; and the judge(s) to whom this case is assigned and any immediate family members thereof.

(Lopez Decl., Ex. C at 9.)  The Class Period is defined as "the period of time between August 1, 2004 and the date of entry of the Court's order granting preliminary approval of the Settlement." (*Id*. at 5.)  The Claims Period is defined as "that period of time that expires nine (9) months from entry of the Court's order granting preliminary approval of the settlement."  (*Id*. at 4-5.)

### 2. Three tiers of class relief.

There are three tiers of relief available to qualified class members.  Tiers 2 and 3 (and Tier 1, if relief is sought for fungal spotting) require class members to attest that at some point previously, they have cleaned their structures built with Trex wood-plastic composite decking ("Trex Structure") at least once with a product containing bleach and detergent or with another product recommended at the time of that cleaning by Trex.  (*Id.* at 13, 15, 20.)

### a. Tier 1 relief.

Qualified class members whose Trex Structure manifests[4] fungal spotting or significant color fading or variation, to be determined by a simple comparison with photographs showing the degree of fading or variation necessary, will be entitled to a $20 cash payment.  While qualified class members whose decking exhibits fungal spotting or color fading or variation may select this Tier 1 relief, alternatively, they may opt for Tier 2 or Tier 3 relief.  (*Id.* at 13-14.)

---

[2] "Trex Structure" means a deck or other structure made with Trex Product.  (Lopez Decl., Ex. C at 10.)

[3] "Trex Product" means "any and all Trex non-shelled wood-plastic composite decking, railing, or fencing material sold under various trademarks set forth in the settlement agreement.  (*Id*. at 10.)

[4] Spotting or color fading/variation must affect at least one-third of the surface of the structure built with Trex wood-plastic composite product.  (*Id*. at 13-14.)

1

**b.     Tier 2 relief.**

2      Qualified class members whose Trex Structure manifests fungal spotting may opt for Tier 2

3   relief.  In order to qualify for Tier 2 relief, class members, who will attest to having cleaned their

4   Trex structure at least once previously, will conduct another cleaning with a product identified in a

5   Trex Mold Technical Bulletin (which bulletin is attached as an exhibit to the settlement agreement)

6   and provide still-photographic or video proof that they have conducted this cleaning.  Then, if

7   spotting returns to at least one-third of the Trex structure after this cleaning, or if it does not go

8   away, as verified with still-photographs or video footage, the class member will qualify for an $18

9   reimbursement for the cleaning product and a certificate entitling him or her to a 40 percent (40%)

10   rebate of the purchase price of Trex's new-generation Transcend or Enhance shelled decking

11   product,[5] which is designed and warranted to resist mold and mildew staining.  (*Id.* at 19-20.)  This

12   certificate also will entitle the class member to the same-size rebate of the purchase price of Trex-

13   brand fasteners, assuming that Trex-brand fasteners were used in the original installation of Trex

14   wood-plastic composite decking, *i.e.*, Trex Product/Structure.[6]

15      This certificate is quite valuable.  For an average-sized deck in which 1,250 linear feet of

16   decking product was used (*see* Dkt. No. 32 at 7), the certificate would qualify the class member to

17   a rebate on the order of $1,405 to $1,800 based on current prices at a major nationwide retailer.

18   (*See* Declaration of Adrian Garcia ("Garcia Decl."), ¶ 5.)  In addition, Trex has verified to plaintiffs

19   that it will sustain a loss for each certificate redeemed, based on 1,250 linear feet of shelled

20   decking purchased.  (*See* n.10, *infra* (referring to declaration of P. Perrone).)

21

**c.     Tier 3 relief.**

22      Class members qualified for Tier 2 relief alternatively can opt for Tier 3 relief.  Tier 3 relief

23   is available largely on the same basis as Tier 2 relief, with the caveat that Tier 3 relief requires

24   testing of small samples of class members' affected decking for specific gravity.  Specific gravity

25

26      [5] The non-transferable certificate is good for one year, with a seven-day allowance for mailing
and receipt of the certificate.  (*Id.* at 20.)

27      [6] The certificates will be good for rebates on Trex shelled decking product and Trex-brand
fasteners up to the same quantity of each that was used in the class members' current Trex
Structure.  (*Id.* at 19-20.)

28

1  is a measure of a material's density, and, as such, it is a marker of how much water the material

2  absorbs.  (Declaration of Anatole A. Klyosov, Ph.D. ("Klyosov Decl."), ¶ 3.)  Moisture, of course,

3  is a necessary condition for fungal growth.  (*Id.*)

4          After conducting the verified cleaning of the Trex Structure with the product referenced

5  above, and assuming the cleaning does not remove the fungal spotting, or that the spotting returns

6  within 60-90 days, the class member can opt to have samples of his or her decking tested for

7  specific gravity by Trex, at Trex's expense, via a protocol accepted by plaintiffs' counsel following

8  consultation with plaintiffs' expert (and whose results are subject to verification).  If the decking

9  tests to below a number negotiated by the parties with expert assistance, then, assuming the class

10  member otherwise qualifies, that class member will qualify for Tier 3 relief.  But if testing of the

11  samples returns a result above the negotiated value – meaning it is more dense, and therefore less

12  water-absorbent[7]– then that class member will not qualify for Tier 3 relief, but without further

13  effort, he or she nonetheless will qualify for Tier 2 relief.  (Lopez Decl., Ex. C at 21.)

14          Under Tier 3, each qualified class member will be entitled to receive an $18 refund for the

15  price of the cleaning product to be used in the verified cleaning.  (*Id.* at 21.)  In addition, the

16  qualified class member will receive one of two alternative forms of relief.

17                              **(1)      Tier 3 relief, first alternative.**

18          Under the first alternative, the qualified class member will receive a certificate entitling him

19  or her to a 50 percent (50%) rebate of the purchase price of any variety of Trex's new-generation

20  Transcend or Enhance shelled decking product, which is designed and warranted to resist mold and

21  mildew staining.  (*Id.* at 21-22.)  This certificate also will entitle the class member to a 50% rebate

22  of the purchase price of Trex-brand fasteners,[8] assuming that Trex-brand fasteners were used in the

23  original installation of Trex wood-plastic composite decking, *i.e.*, Trex Product/Structure.[9]

24          Again, this certificate is quite valuable.  For an average-sized deck in which 1,250 linear

25  feet of decking product was used, the certificate would qualify the class member to a rebate on the

---

26      [7] Klyosov Decl., ¶ 3.

27      [8] *See* n.6, *supra*.

28      [9] *See* n.6, *supra*.

order of $1,756.25 to $2,250 based on current prices at a major nationwide retailer. (Garcia Decl., ¶ 5.) In addition, per Trex's verification, it will sustain a loss for each certificate redeemed, based on 1,250 linear feet of shelled decking purchased. (*See* n.10, *infra* (referring to declaration of P. Perrone).)

Further, under this first alternative, the qualified class member will receive a partial labor reimbursement of $0.23 (23 cents) per linear foot of Trex Product used in his or her current Trex Structure. (Lopez Decl., Ex. C at 22.) For an average-sized deck made with 1,250 linear feet of decking, this works out to $287.50 in cash relief.

**(2)    Tier 3 relief, second alternative.**

As for the second alternative, the Tier 3 qualified class member can opt for a 20 percent (20%) refund of the purchase price of his or her current Trex Structure. This refund will be based on the purchase price of Trex Product and Trex-brand fasteners as well, assuming the latter also were used in the structure. (*Id.* at 23.)

**3.    Rights of appeal.**

While Trex will administer the bulk of the settlement, class members also have rights of appeal to a neutral third-party adjudicator. Class members have rights of appeal to this adjudicator, which will be paid by Trex, regarding proof of spotting coverage over their Trex structures; the results of specific gravity testing; and claims determination. (*Id.* at 19, 21-22, 24-25.)

**4.    Cost cap.**

There is an $8.25 million cost cap in the settlement. (*Id.* at 25.) But $8.25 million is *not* the upper value of the settlement to class members. This is because charges against the cap are measured in terms of costs to Trex, including net costs[10] for the rebate certificates rather than the redeemed value of the certificates, and subject to verification by class counsel. (*Id.*) Thus, if a class member receives a $2,250 check after redeeming a rebate certificate, $2,250 is not charged against the cap; instead, a considerably smaller amount is charged. (*Cf.* Garcia Decl., ¶¶ 5-6 *with* Perrone

---

[10] *See* Declaration of Patrick J. Perrone ("Perrone Decl."), ¶¶ 5-6, which is submitted to the Court contemporaneously with this motion, and with a request from Trex that it be filed and kept under seal because of the sensitive commercial information regarding Trex product costs that it contains.

1   Decl., ¶¶ 5-6.)  Accordingly, the settlement has much higher potential value to the class than $8.25

2   million.

3   Furthermore, costs for administration of the settlement, notice, specific gravity testing,

4   service awards to named plaintiffs, dispute resolution, and attorneys' fees and costs are not counted

5   against this cost cap.  Trex will provide class counsel with quarterly reports of its costs as defined

6   in the agreement.  (Lopez Decl., Ex. C at 25, 28.)

7   In addition, there is a yearly cost cap.  This cap is at $6.75 million for the first 12 months,

8   measured from the time of the first disbursement of relief pursuant to the settlement.  Relief

9   corresponding to costs to Trex above this sum in the first 12 months will be deferred to the next

10   year, up to a total value in terms of costs to Trex of $8.25 million.  (*Id*. at 25-26.)

11   In order to ensure the fair treatment of all class members under the overall cost cap of

12   $8.25 million, the parties have agreed to a protocol whereby, following the claims period, Trex, in

13   consultation and cooperation with Class Counsel, will assess the maximum potential cost of all

14   claims.  If the maximum potential cost is less than $8.25 million, then Trex will proceed with

15   paying each claim as it becomes complete and verified in accordance with the terms of the

16   settlement (subject to the yearly cost cap referenced above).  If, on the other hand, the maximum

17   potential cost of claims is more than $8.25 million, then Trex will delay payment on all claims until

18   all claims are complete and verified in accordance with the terms of the settlement.  Once all

19   claims are complete and verified, then Trex, in consultation and cooperation with Class Counsel,

20   will determine if indeed the total cost of claims will exceed $8.25 million.  If the total cost does

21   exceed that sum, then all claims will be pro-rated downward on an equal basis, so that the cap is

22   reached but not exceeded.  If the total cost does not exceed that sum, then all claims will be paid in

23   full.  (*Id*. at 26-28.)

24   **5.      Notice and release.**

25   The parties' settlement provides for robust notice.  The first component is direct notice to

26   all persons complaining of fungal spotting or color variation or fading to Trex or to counsel for the

27   plaintiffs in this action.  The second component is notice in three national publications: *USA*

28   *Today*, *Professional Deck Builder* magazine, and *Deck World* magazine.  The third component will

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY APPROVAL  – 5:09-CV-00670-JSW           - 9 -
010095-13  599585 V1

consist of web notice via Trex's website and a settlement website to be established by Trex, at its expense.  The fourth component will include Internet notice via sponsored links covering the concept(s) "Trex mold spotting/color fading/color variation settlement" for searches made through Google, Yahoo, Bing, and AOL, at an aggregate cost of $10,000; it also will include website banner advertisements placed on four websites with regular traffic concerning Trex products and decking projects and concerns, again at an aggregate cost of $10,000.  In addition, Trex will formally advise all of its distributors and retailers of the parties' settlement in writing, such that retailers will be able to direct consumers to the settlement website and to advise them on how to obtain claim forms.  These forms of notice were chosen following negotiation by the parties and consultation by plaintiffs' counsel with representatives of Gilardi & Co. LLC and its sister-company advertising arm, Larkspur Design Group, which specializes in legal notice placement. (*Id*. (Lopez Ex. C) at Ex. G thereto.)

Trex is responsible under the settlement for making all arrangements necessary to effecting the agreed-upon notice program, as well as all costs related to that program.  Prior to the final settlement hearing, Trex will file an affidavit confirming that notice has been provided as set forth in the settlement agreement and ordered by the Court.  (*Id*. at 28-29.)

The long-form notice describes the material terms of the settlement and the procedures that class members must follow in order to receive settlement benefits.  The notice also describes the procedures for class members to exclude themselves from the settlement or to provide comments in support of or in objection to it.  Any class member who wishes to be excluded from the settlement need only opt-out by making a timely request.  The procedures for opting-out are those commonly used in class-action settlements, and they are straightforward and plainly described in the class notice.[11]  The short-form notice provides a summary of the foregoing.  (*Id.* at 29 and Ex. G thereto (including short- and long-form notices).)

---

[11] The settlement agreement also provides that if opt-outs exceed a confidential number, which is provided to the Court via the Perrone declaration that the parties seek to file under seal, then Trex will have the option to walk away from the settlement or to continue under it with no variations to its terms.  (*Id.* at 34-35.)

1    If the Court grants final approval of the settlement following notice, and after the time

2    period for opt-out requests and objections expires, then all class members who have not excluded

3    themselves from the class will be deemed to have released all Covered Claims against Trex, as

4    Trex is defined in the settlement agreement.  (*Id.* at 32-33.)

5         **6.    Service awards and attorneys' fees, costs, and expenses.**

6    The parties have agreed that each named plaintiff[12] will receive an award of $7,500 for his

7    or her service in this matter.  Plaintiffs assisted counsel with the preparation of complaints in this

8    matter, and have sat for depositions and made their decks available for inspection by Trex.  In

9    addition, each worked with plaintiffs' counsel in responding to Trex's discovery requests,

10   including the provision of written answers and documents as available.  Each also was consulted in

11   conjunction with Trex's motion to transfer this case to the Western District of Virginia, and several

12   filed declarations in opposition to that motion.  Each has monitored this litigation on behalf of

13   absent, putative class members, and each has consulted with plaintiffs' counsel regarding the terms

14   of this settlement (and given their approval to it).  Finally, none of the plaintiffs will receive

15   anything more from this settlement than any other class member.  Instead, he or she will only be

16   entitled to the same relief, subject to the same conditions, as any other class member.  (*Id.*, ¶ 14.)

17   As for plaintiffs' attorneys' fees, costs, and expenses, the parties negotiated these with the

18   assistance of Judge Andersen following negotiation of the substantive terms of the proposed class

19   settlement.  After a lengthy back-and-forth, the parties have agreed that Trex will not oppose a

20   request by class counsel for $1.475 million, inclusive of attorneys' fees, costs, and expenses,

21   including, but not limited to expert fees.  This $1.475 million sum is in addition to, and will not in

22   any way affect, the sums available to plaintiffs and class members under the settlement.  (*Id.*, ¶ 15.)

23              **IV.    ARGUMENT**

24   **A.    The Court Should Grant Preliminary Approval to the Settlement**

25   Settlements are to be encouraged in class-action lawsuits.  The Court, however, must

26   approve class settlements, and in so doing, it must examine "whether a proposed settlement is

27

28   _____
     [12] Dr. and Ms. Hass will receive a single award of $7,500 between them.

1   'fundamentally fair, adequate, and reasonable.'" *Burden v. SelectQuote Ins. Servs.*, 2013 U.S. Dist.

2   LEXIS 41522, at *6 (N.D. Cal. Mar. 21, 2013) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th

3   Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1988)).  Approval of

4   a class-action settlement proceeds through two stages:  preliminary approval and final approval.

5   Because the settlement in this matter passes the standards set for this first step in the approval

6   process, plaintiffs ask the Court to grant their request for preliminary approval.

7           **1.     Negotiated class-action settlements are desirable.**

8           Negotiated settlements like the instant one are to be encouraged.  As the Ninth Circuit has

9   stated, "there is an overriding public interest in settling and quieting litigation.  This is particularly

10  true in class action suits. . . ."  *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1229 (9th Cir. 1989)

11  (citing *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976)); *see also Churchill*

12  *Village, L.L.C. v. General Elec.*, 361 F.3d 566, 576 (9th Cir. 2004); *In re Pacific Enters. Sec. Litig.*,

13  47 F.3d 373, 378 (9th Cir. 1995).  Settlement is desirable in class action suits because they are "an

14  ever increasing burden to so many federal courts and [] frequently present serious problems of

15  management and expense."  *Van Bronkhorst*, 529 F.2d at 950.

16          Additionally, courts should give "proper deference" to a parties' settlement.  "[T]he court's

17  intrusion upon what is otherwise a private consensual agreement negotiated between the parties to

18  a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement

19  is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and

20  that the settlement, taken as a whole, is fair reasonable and adequate to all concerned."  *Hanlon*,

21  150 F.3d at 1027 (quotations omitted); *see also Chavez v. WIS Holding Corp.*, 2010 U.S. Dist.

22  LEXIS 56138, at *4 (S.D. Cal. June 7, 2010) ("The Court gives weight to the parties' judgment

23  that the settlement is fair and reasonable.") (citing *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378

24  (9th Cir. 1995)).

25          **2.     The settlement passes the standards for preliminary approval.**

26          As stated above, there is a two-step process for approval of a class-action settlement.  The

27  first of these steps is preliminary approval.  *See Manual for Complex Litigation* § 13.14, at 173 (4th

28

ed. 2004)[13] ("This [approval of a settlement] usually involves a two-stage procedure.  First, the judge reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice and a hearing.  If so, the final decision on approval is made after the hearing."); *see also id.*, § 21.632, at 320 ("Review of a proposed class action settlement generally involves two hearings.  First, counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation. . . .") (footnote omitted); Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.25, at 38-39 (4th ed. 2002) (discussing the two-step approval process).

At the preliminary approval stage, the Court asks whether "'[1] the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls within the range of possible approval[14]. . . .'"  *See*, *e.g.*, *Burden*, 2013 U.S. Dist. LEXIS 41522, at *9 (citing *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)).  Put another way, the Court should "make a preliminary determination of the fairness, reasonableness, and adequacy of the settlement terms . . . ."  *Manual for Complex Litig.* § 21.632.

Because a preliminary evaluation of the instant settlement will reveal no "grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation for attorneys," and because the settlement "appears to fall within the range of possible approval," the settlement passes this initial evaluation.  *See Newberg on Class Actions* § 11.25; *see also In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079-80.  Accordingly, as demonstrated below, the Court should grant preliminary approval.

---

[13] Hereafter, *Manual for Complex Litig.*

[14] Where, as here, the settlement was attained via "arms-length negotiations," following "meaningful discovery," in which the parties were represented by "experienced, capable" counsel, the Court may afford to it "a presumption of fairness, adequacy, and reasonableness."  *See*, *e.g.*, *Arnold v. Arizona Dep't of Pub. Safety*, 2006 U.S. Dist. LEXIS 53315, at *32-33 (D. Ariz. July 31, 2006) (citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005); *Newberg on Class Actions* § 11.41, at 90 ("There is usually a presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for approval.").

1

2

**a.      The settlement is the product of well-informed, vigorous, and thorough arms'-length negotiation.**

3

In contemplating preliminary approval, one of the Court's duties is to ensure that "the

4

agreement is not the product of fraud or overreaching by, or collusion between, the negotiating

5

parties . . . ."  *Hanlon*, 150 F.3d at 1027 (internal quotes and citations omitted).  As set forth above,

6

the settlement in this matter was achieved only after: a lengthy investigation of plaintiffs' claims,

7

including the review of hundreds of complaints from Trex customers, together with photographs of

8

spotted and discolored decks; thorough discovery; consultation with a well-credentialed expert on

9

wood-plastic composites who authored a book on the subject matter, for which he had studied

10

various decking products, including the Trex decking here at issue; and much negotiation with the

11

aid of a retired federal and state judge, who conducted two in-person mediations with the parties

12

(one of which was attended by the parties' technical consultants) and numerous follow-up

13

communications via phone and in writing, all over a span of many months.  (Lopez Decl., ¶¶ 7-13;

14

Klyosov Decl., ¶¶ 1, 5.)  Further, the parties in this matter were represented throughout by counsel

15

with extensive experience in class-action and commercial litigation.  (Lopez Decl., ¶ 9 and Ex. A.)

16

Because of the foregoing, plaintiffs' counsel were well situated to evaluate the strength and

17

weakness of plaintiffs' case.  Far from being the product of anything inappropriate, the settlement

18

at issue is the result of long, hard-fought, adversarial work, such that it is worthy of preliminary

19

approval by the Court.  *Cf. Hanlon*, 150 F.3d at 1027 (no basis to disturb settlement where there

20

was no evidence suggesting that the settlement was negotiated in haste or in the absence of

21

information).

22

**b.      The settlement bears no obvious deficiencies.**

23

Furthermore, the settlement bears no obvious deficiencies.  *See Burden*, 2013 U.S. Dist.

24

LEXIS 41522, at *8.  There are no patent defects that would preclude approval of the settlement,

25

such that notifying the class and proceeding to a formal fairness hearing would be a waste of time.

26

*See Newberg on Class Actions* § 11.25 (referring to the Court's inquiry as to, *inter alia,* "obvious

27

deficiencies").  An examination of the settlement reveals no apparent unfairness, and no "unduly

28

preferential treatment of a class representative or segments of the Settlement Class, or excessive

1  compensation for attorneys." *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 2012 U.S. Dist.

2  LEXIS 149738, at *18 (D. Minn. Oct. 18, 2012) ("There are no grounds to doubt the fairness of the

3  Settlement, or any other obvious deficiencies, such as unduly preferential treatment of a class

4  representative or segments of the Settlement Class, or excessive compensation for attorneys.").

5        To the contrary, the settlement provides cash relief to those class members whose Trex

6  structures exhibit color fading or variation, or fungal spotting, over a significant portion of their

7  surface area. And it provides very substantial relief to those who demonstrate irremediable fungal

8  spotting, in the form of a refund for cleaning product and *40% rebates on the retail purchase price*

9  of Trex shelled decking products. In addition, for those who submit samples of their decking for

10  specific gravity testing, and whose decking tests at or below an agreed number, the settlement

11  provides not only a *50% rebate* on the shelled decking, but also a partial labor reimbursement. Or,

12  in the alternative, these latter class members can opt for a partial cash refund on their current decks,

13  including Trex-brand fasteners if used, in addition to a cash refund for cleaning product. These

14  rebates alone are worth thousands of dollars when applied to purchases of product sufficient to

15  build an average-sized deck, and a partial cash refund on currently installed decking will likely be

16  in the range of several hundred dollars and up for average-or-larger sized structures. (Garcia Decl.,

17  ¶¶ 5-7.) These forms of relief are fair, given the challenge to plaintiffs' case as discussed in

18  Section IV.A.2.C of this memorandum, *infra*.

19        Further, there is no preferential treatment of class members or segments of the class.[15]

20  Everyone, including class members, is treated equally. Tier 1 offers a flat amount of compensation

21  to all qualified class members. Rebates are based on the amount of replacement product

22  purchased, and the partial labor reimbursement and (alternative) cash option for Tier 3-qualified

23

24        [15] As for service awards to the named plaintiffs, these are supported by precedent and also by
the attention that plaintiffs have devoted to this matter, including by way of assisting counsel with
25  the preparation of complaints in this matter, responding to discovery requests, making themselves
available for inspections of their Trex structures, and monitoring this matter and consulting with
26  counsel as needed on behalf of not only themselves but the class they seek to represent. *See* Dkt.
No. 152 herein at 3-4 (approving $7,500 in service awards to class representatives in surface
27  flaking case against Trex); *Pelletz v. Weyerhaeuser Corp.*, 592 F. Supp. 2d 1322, 1330 (W.D.
Wash. 2009) (approving $7,500 incentive awards for class representatives in class action case
28  arising from defects in composite decking materials).

1    claimants is based on the amount of product in the class member's current structure.  Additionally,

2    there is an adjudication process in place to provide further assurance that claimants will be treated

3    fairly and equitably.  (Lopez Decl., Ex. C at 19, 21-22, 24-25.)

4          Finally, as for attorneys' fees, costs, and expenses, plaintiffs' recovery is capped at

5    $1.475 million.  Negotiations over attorneys' fees, costs, and expenses were separate from, and

6    took place after, negotiations regarding relief to the class.  Further, as with the separate

7    negotiations over class relief, the parties' negotiations over fees, costs, and expenses were

8    conducted with the aid of Judge Andersen.  The sum negotiated for fees, costs, and expenses is fair

9    in light of the years spent by counsel on this matter, their experience, and the results achieved for

10   the class.  (*See* Lopez Decl., ¶ 15.)

11          **c.      The settlement falls within the range of possible approval.**

12          According to the Ninth Circuit, the Court should consider whether "the settlement, taken as

13   a whole, is fair, reasonable and adequate to all concerned."  *Hanlon*, 150 F.3d at 1027 (internal

14   quotes and citations omitted).  Still, the Court at this point does not conduct the fuller analysis that

15   occurs upon the motion for final approval.  *Chin v. RCN Corp.*, 2010 U.S. Dist. LEXIS 31272, at

16   *9 (S.D.N.Y. Mar. 12, 2010) ("In fact, 'a full fairness analysis is neither feasible nor appropriate'

17   when evaluating a proposed settlement agreement for preliminary approval.") (citation omitted).

18   Here, the parties' settlement – which will afford thousands of dollars in relief to each class member

19   who demonstrates that his or her average-sized Trex structure exhibits irremediable fungal

20   spotting; which provides for dispute resolution; which provides for a narrow release; and which

21   otherwise appears to be reasonable – falls within the range of possible approval, such that

22   preliminary approval is warranted.

23          "To evaluate the 'range of possible approval' criterion, which focuses on 'substantive

24   fairness and adequacy,' 'courts primarily consider plaintiffs' expected recovery balanced against

25   the value of the settlement offer.'"  *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114,

26   1125 (E.D. Cal. 2009) (citing *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080).  In this

27   case, while consumers' reported experience, plaintiffs' technical analysis, and evidence gathered in

28

1    discovery supported plaintiffs' allegations of a defect or defects in Trex's wood-plastic composite

2    decking, plaintiffs' success was not without doubt.  (Lopez Decl., ¶ 13.)

3         For example, the plaintiffs faced specific exclusions in Trex's written warranty for mold

4    and mildew/environmental conditions, as well as the costs of labor (*i.e.*, to tear down and rebuild

5    decks).  In addition, Trex's warranty excluded coverage for conditions caused by improper

6    installation, which Trex has contended can lead to standing moisture and mold and mildew

7    spotting.  (Lopez Decl., Ex. B.)  Furthermore, Trex contested the allegations that there were defects

8    in its product.  (Lopez Decl., ¶ 13.)  In part, it pointed to information it produced in discovery

9    purporting to show that complaints it received corresponded to a very small percentage of decking

10   sold.  (*Id.*)  Additionally, Trex promised to contest class certification vigorously on grounds that

11   plaintiffs necessarily took seriously.  (*Id.*)

12        Still, at every stage of this case, plaintiffs pushed back, reminding Trex of the strength of its

13   own positions.  But ultimately, after taking into account the risk expense, complexity, and likely

14   duration of further litigation, *see Burden*, 2013 U.S. Dist. LEXIS 41522, at *7 (citation omitted),

15   plaintiffs and their experienced counsel, with the aid of Judge Andersen, were able to achieve a

16   settlement that allows for three tiers of valuable relief to qualified class members.[16]

17        As explained above, two of these tiers involve cash rebates that are far from *de minimis* in

18   size.  Rather, these rebates will amount to thousands of dollars in refunds on quantities of new-

19   generation decking sufficient to build average-sized (or even smaller) structures.  Moreover, they

20   will not result in more profit to Trex through increased sales to class members.  Instead, with the

21   high percentages that plaintiffs negotiated, each rebate corresponding to a purchase of mold-

22   resistant decking in that average-sized quantity (or something anywhere near it) will result in a loss

23   to Trex.  (*See* Perrone Decl., ¶¶ 5-6.)

---

[16] Additionally, plaintiffs were (and are) very disturbed at what they considered to be
misleading marketing on the part of Trex with respect to their wood-plastic composite decking.
They also contended that Trex should have ensured that its written warranty documents were given
to them at or before the time of purchase.

Plaintiffs sought injunctive relief to remedy these problems.  As part of this settlement, Trex
has agreed that in the very near future, it will cease the sale of this product altogether.  And while
sales wind down, Trex will fortify efforts to ensure that its warranty documents are available to
retail customers at the point of sale.  (Lopez Decl., Ex. C at 23-24.)

1    In short, the settlement falls within the range of possible approval.  For this reason, too, the

2    Court should grant preliminary approval.

3    **B.      The Proposed Class Should Be Certified for Settlement Purposes**

4    The Court has not yet granted class certification in this matter.  Accordingly, plaintiffs ask

5    that the Court certify provisionally a nationwide class for settlement purposes.  Provisional

6    certification will permit notice of the proposed class to be issued to the class.  Such notice will

7    inform class members of the existence and terms of the settlement agreement, of their right to be

8    heard regarding its fairness, of their right to opt-out, and of the date, time, and place of the fairness

9    hearing.  *See Manual for Complex Litig.* §§ 21.632, 21.633.  Here, where Trex has waived its

10   challenges to class certification in light of the parties' settlement, *Hanlon* provides the roadmap for

11   the Court's consideration of plaintiffs' request.

12   **1.      The proposed class meets the *Amchem* requirements for certification of a
         settlement class.**

13
14   In *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997), the Supreme Court of the

15   United States confirmed the propriety, and recognized the necessity, of settlement class

16   certification in matters such as this one, where class members are identifiable, and where there are

17   relatively small economic damages.  As the Court put it,

18            [t]he policy at the very core of the class action mechanism is to
              overcome the problem that small recoveries do not provide the
19            incentive for any individual to bring a solo action prosecuting his or
              her rights.  The class action solves this problem by aggregating the
20            relatively paltry potential recoveries into something worth someone's
              (usually an attorney's) labor.

21   *Id.* at 617 (internal quotes and citations omitted).

22   Here, there is one product at issue, an alleged course of conduct common to all class

23   members, and only economic damages at stake; thus, this is the kind of class action endorsed in

24   *Amchem*.  Without this class action and settlement, most class members would be "without

25   effective strength to bring their opponents into court at all."  *Id.*  In a situation such as this, where

26   the proposed class seeks only economic damages (as distinct a class or classes seeking

27   individualized personal injury and future-injury damages), class certification is eminently proper.

28   *E.g.*, *Hanlon*, 150 F.3d at 1019-23.

**2.      The Rule 23(a) requirements for numerosity, commonality, typicality, and adequacy are met.**

In order to merit class certification, plaintiffs must show at the outset that the class is so numerous that joinder is impracticable; questions of law or fact are common to the class; the claims of the representative plaintiffs are typical of the claims of the class; and the proposed class representatives will protect the interests of the class fairly and adequately.  Fed. R. Civ. P. 23(a). Plaintiffs meet these prerequisites.

**a.      Numerosity.**

Trex has disclosed that it has received over 11,000 complaints or claims related to fungal spotting and color variation/fading (or a combination thereof) on its wood-plastic composite decking.  Counsel for plaintiffs have received well over a thousand more.  (Lopez Decl., ¶ 13.)  On the basis of these numbers alone, "joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Given these large numbers, the requirement of numerosity is easily satisfied here.  *See*, *e.g.*, *Immigrant Assistance Project of L.A. Cnty. Fed'n of Labor (AFL-CIO) v. I.N.S.*, 306 F.3d 842, 869 (9th Cir. 2002) (noting that numerosity requirement has been satisfied in cases involving 39 class members); *Newberg on Class Actions* § 3.5 ("In light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone.").

**b.      Commonality.**

As one court recently summarized:

> Commonality requires the existence of questions of law or fact that are common to the class.  Fed. R. Civ. P. 23(a)(2).  Commonality focuses on the relationship of common facts and legal issues among class members.  *See*, *e.g.*, 1 William B. Rubenstein, *Newberg on Class Actions* § 3:19 (5th ed. 2011).  Courts construe this requirement permissively.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1988).  "All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*  In fact, it only takes one common question of fact or law shared between proposed class members to satisfy commonality.  *Dukes*, 131 S. Ct. at 2556.

1    *Marilley v. Bonham*, 2012 U.S. Dist. LEXIS 33678, at *9-10 (N.D. Cal. Mar. 13, 2012).  The

2    requirement of commonality is satisfied by plaintiffs' allegations.

3    Among the common questions raised are whether there was a common defect or defects in

4    Trex wood-plastic composite decking; whether Trex knew of any such defect; whether Trex had a

5    duty to disclose any such defect; whether Trex concealed such defect(s) from the class; whether

6    Trex failed to disclose material facts regarding its decking; whether the products at issue were free

7    from material defects in workmanship and materials, as promised by Trex's express warranty; and

8    whether any defect or defects in Trex's product caused a breach of Trex's implied warranty of

9    merchantability.  The Ninth Circuit cited a list of common questions including ones similar to these

10   in *Chamberlain v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005), where it found

11   commonality.  Plaintiffs have identified numerous questions of law and fact common to the class,

12   such that the requirement of commonality is met.

13                **c.      Typicality.**

14   Typicality is met as well.  Indeed, a finding of commonality ordinarily will satisfy the

15   requirement of typicality, too.  *Barefield v. Chevron U.S.A., Inc.*, 1987 WL 65054, at *5 (N.D. Cal.

16   Sept. 9, 1987.

17                         Rule 23(a)(3) requires that "the claims or defenses of the
                          representative parties be typical of the claims or defenses of the
18                        class."  []  "The purpose of the typicality requirement is to assure that
                          the interest of the named representative aligns with the interests of
19                        the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 408 (9th
                          Cir. 1992).
20
21   *Burden*, 2013 U.S. Dist. LEXIS 41522, at *12-13 (citation omitted).  Here, the interests of the

     named plaintiffs and class members align neatly.
22
23   Plaintiffs have the same claims as members of the class they seek to represent, and they

24   must satisfy the same legal elements that class members must satisfy.  They share identical legal

25   theories with putative class members, based on allegations that Trex marketed and sold defective

26   products.  Their injuries are the same, too; like others in the proposed class, plaintiffs overpaid for

27   product that allegedly bore latent defects.  Thus, Rule 23(a)(3) is satisfied.

28

1

              d.      Adequacy.

2            Finally, it must be determined whether plaintiffs "will fairly and adequately represent the

3    interests of the class." Fed. R. Civ. P. 23(a)(4). "In making this determination, courts must

4    consider two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest

5    with other class members and (2) will the named plaintiffs and their counsel prosecute the action

6    vigorously on behalf of the class?'" *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031

7    (9th Cir. 2012) (citation omitted). Plaintiffs meet this requirement as well.

8            First, plaintiffs' claims are co-extensive with members of the putative class. All have an

9    identical interest in establishing Trex's liability, and each has been injured in the same manner. All

10   assert the same legal claims, and all seek identical relief. There is no conflict among them.

11           Also, each named plaintiff has agreed to assume the responsibility of representing the class,

12   and each has made him- or herself available to do so, including by way of responding to discovery,

13   testifying at depositions, and consulting with counsel during the course of this litigation. (*See*

14   Lopez Decl., ¶ 14.)

15           Second, as discussed and referenced in the declaration of counsel and its Exhibit A,

16   plaintiffs' lawyers have extensive experience and expertise in prosecuting complex class actions,

17   including commercial, consumer, and product defect actions. Counsel have pursued this litigation

18   vigorously, and plaintiffs' attorneys are committed to advancing and protecting the common

19   interests of all members of the class. (*Id.* at, *e.g.*, ¶15.)

20           Rule 23(a)(4) is satisfied.[17]

21       **3.      Common questions predominate, and a class action is the superior method to
                 adjudicate class members' claims.**

22

23           Once the prerequisites of Fed. R. Civ. P. 23(a) are satisfied, the Court must determine if one

     of the subparts of Rule 23(b) is also satisfied. Here, Rule 23(b)(3) is satisfied because questions

24   common to class members predominate over questions affecting only individual class members,

25   and the class action device provides the best method for the fair and efficient resolution of class

26

27   ───────────────────
         [17] And, for the reasons set forth herein, plaintiffs ask that they be appointed class representatives
28   for the requested class and that Hagens Berman Sobol Shapiro LLP be appointed class counsel.

members' claims.  Furthermore, Trex does not oppose provisional class certification for purposes of giving effect to the parties' settlement.  When addressing the propriety of class certification, the Court should consider the fact that, in light of the settlement, trial will now be unnecessary, such that the manageability of the class for trial purposes is not relevant to the Court's inquiry.  *E.g.*, *Hanlon*, 150 F.3d at 1021-23.

### a.    Common questions predominate.

Rule 23(b)(3) requires an examination of whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ."  "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," class treatment is justified.  *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund. v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001).  Even one issue of central importance to the case and common to all class member claims . . . can cause class litigation to be appropriate.  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1231-32 (9th Cir. 1996).  Here, common questions predominate.

Common questions include whether Trex's wood-plastic composite products are defective, whether Trex knew as much and concealed its knowledge, and whether Trex had a duty to disclose what it knew, among others discussed above.  These numerous common questions at the heart of this matter predominate over any issues affecting only individuals.  Predominance is established.

### b.    Class treatment is the superior method for adjudicating claims of members of the proposed class.

As for the requirement in Fed. R. Civ. P. 23(b)(3) that the class action be "superior to other available methods for fair and efficient adjudication of the controversy," class treatment will facilitate the fair and efficient resolution of all putative class members' claims.  Given that plaintiffs are aware of thousands of class members sharing common issues, the class device is the most efficient and fair means of adjudicating all these many claims.  Class treatment is far superior to thousands of individual suits or piecemeal litigation; in this matter, it will fulfill its function of conserving scarce judicial resources and promoting the consistency of adjudication.  Accordingly, the superiority aspect of Rule 23(b)(3) is readily met.

1    **C.**      **The Court Should Approve the Proposed Forms and Methods of Class Notice**

2             "Rule 23(e)(1)(B) requires the court to 'direct notice in a reasonable manner to all class

3    members who would be bound by a proposed settlement, voluntary dismissal, or compromise . . . .'"

4    *Manual for Complex Litig.* § 21.312, at 293.  In order to protect the rights of absent class members,

5    the Court must direct the best notice practicable to class members.  *See*, *e.g.*, *Phillips Petroleum Co.*

6    *v. Shutts*, 472 U.S. 797, 811-12 (1985); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174-75 (1974).

7             Additionally, "Rule 23 . . . requires that individual notice in [opt-out] actions be given to

8    class members who can be identified through reasonable efforts.  Those who cannot be readily

9    identified must be given the 'best notice practicable under the circumstances.'"  *Manual for*

10   *Complex Litig.* § 21.311, at 287.  In this case, the notice plan calls for notice to be mailed – or

11   where no physical address is available, but an electronic mail address is available, emailed[18] – to

12   known class members, *i.e.*, those who have complained to Trex or plaintiffs' counsel of fungal

13   spotting, color variation, or color fading on their wood-plastic composite decking.

14            With respect to class members whose identities are unknown,[19] the settlement calls for the

15   publication and Internet notice campaigns described above.  (*See also* Lopez Decl., Ex. C at Ex. G

16   thereto.)  Notice by publication is an acceptable method of providing notice where the identify of

17   specific class members is not reasonably available.  *In re Tableware Antitrust Litig.*, 484 F. Supp.

18   2d at 1080 (citing *Manual for Complex Litig.* § 21.311); *see also Norflet v. John Hancock Life Ins.*

19   *Co.*, 658 F. Supp. 2d 350, 352 (D. Conn. 2009) (approving a notice plan utilizing Internet banner

20   advertisements); *In re HP Laser Printer Litig.*, 2011 WL 3861703, at *3 (C.D. Cal. Aug. 31, 2011)

21   (approving a notice plan utilizing direct email notice, publication of the summary notice in print

22

23   _____

24            [18] As for the fallback email aspect of the plan, in most if not all cases, where Trex or plaintiffs'
     counsel have class member email addresses, it is because putative class members communicated
25   with them via that method, making email notice particularly suitable.  *See Browning v. Yahoo! Inc.*,
     2006 WL 3826714, at *8 (N.D. Cal. Dec. 27, 2006) (approving notice program employing email
26   "where Settlement Class Members' allegations ar[ose] from their visits to Defendants' Internet
     websites, demonstrating that the Settlement Class members [we]re familiar and comfortable with
27   email and the Internet.").

28            [19] Trex did not sell its products directly to consumers, so it does not know their identities or
     addresses as a matter of course.

publications, banner advertisements on websites, and "providing a link on both notice forms to a settlement website.").

The settlement notice itself should:

- define the class;

- describe clearly the options open to class members and the deadlines for taking action;

- describe the essential terms of the proposed settlement;

- disclose any special benefits provided to the class representatives;

- provide information regarding attorney fees;

- indicate the time and the place of the hearing to consider approval of the settlement, and the method for objecting to or opting out of the settlement;

- describe the method for objecting to or opting out of the settlement;

- explain the procedures for allocating and distributing settlement funds and clearly set forth any variations among different categories of class members;

- explain the basis for valuation of non-monetary benefits;

- provide information that will enable class members to estimate their individual recoveries; and

- prominently display the address and phone number of class counsel and how to make inquiries.

*Manual for Complex Litig.* § 21.312, at 295 (citation omitted).  Here, the notice forms attached to the parties' settlement satisfy these requirements.  (*See also* Lopez Decl., Ex. C at Ex. G thereto (short- and long form notices).)

The notice plan and documents are designed to afford notice in a comprehensive and reasonable manner.  Plaintiffs respectfully ask the Court to approve them.

**D.    The Court Should Set a Schedule for Toward Final Approval of the Parties' Settlement**

If the Court grants preliminary approval and provisionally certifies the settlement class, the Court then should set a schedule toward final approval of the parties' settlement.  The parties

1   propose the following schedule, which is incorporated in the proposed order submitted with this

2   motion:

3         Dissemination of notice:  Direct mail/email and web notice within 14 days of preliminary

4   approval, with publication notice published as soon as practicable after preliminary approval;

5         Last day for class members to request exclusion from the Settlement Class:  45 days from

6   the last date that Notice is sent by Trex or first published as set forth in the Notice Plan;

7         Last day to file papers in support of final approval of the settlement; an affidavit from Trex

8   regarding completion of the notice program; and plaintiffs' motion for attorneys' fees, costs, and

9   expenses[20]:  35 days before the final settlement approval hearing;

10        Last day for class members to file comments in support of, or in objection to, the settlement

11  agreement and/or motion for attorneys' fees and costs:  21 days before the final settlement approval

12  hearing;

13        Last day for replies to any class member objections:  7 days before the final settlement

14  approval hearing;

15        Final settlement approval hearing:  To be set by the Court; and

16        Claims deadline:  Nine months from the date of preliminary approval.

## V.        CONCLUSION

18        For all of the foregoing reasons, plaintiffs ask respectfully that the Court grant preliminary

19  approval of the class settlement, grant provisional approval of the settlement class, appoint the

20  named plaintiffs as class representative, appoint Hagens Berman Sobol Shapiro LLP as class

21  counsel, approve the notice program agreed-to by the parties, and establish the deadlines requested

22  in this motion.

23

24

25

26        ───────────────
          [20] This schedule provides that the motion for attorneys' fees, costs, and expenses will be filed at
27  a reasonable time before the date for objections.  *See In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988, 995 (9th Cir. 2010) (holding that class members should have adequate time to
28  review motion for attorneys' fees before deadline for objections).

1    Dated: April 5, 2013.

2                                          HAGENS BERMAN SOBOL SHAPIRO LLP

3

4                                          By _____/s/ Steve W. Berman_____
                                                 Steve W. Berman
5                                          Steve W. Berman (*pro hac vice*)
                                           Robert F. Lopez (*pro hac vice*)
6                                          HAGENS BERMAN SOBOL SHAPIRO LLP
                                           1918 Eighth Avenue, Ste. 3300
7                                          Seattle, WA  98101
                                           Telephone:  (206) 623-7292
8                                          Facsimile:   (206) 623-0594
                                           steve@hbsslaw.com
9                                          robl@hbsslaw.com

10
                                           Jeff D. Friedman (173886)
11                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                           715 Hearst Avenue, Suite 202
12                                         Berkeley, CA 94710
                                           Telephone:  (510) 725-3000
13                                         Facsimile:   (510) 725-3001
                                           jefff@hbsslaw.com
14

15                                         *Lead Counsel for the Proposed Class and Attorneys
                                           for Gretchen Silverman, Thomas Schauppner,
16                                         Marjorie Zachwieja, and Sheila Shapiro*

17                                         Jonathan D. Selbin (170222)
                                           Nimish R. Desai (244953)
18                                         LIEFF CABRASER HEIMANN
                                               & BERNSTEIN, LLP
19                                         275 Battery Street
                                           San Francisco, CA  94111-3336
20                                         Telephone:  (415) 956-1000
                                           Facsimile:   (415) 956-1008
21

22                                         Elizabeth A. Alexander (*pro hac vice*)
                                           LIEFF CABRASER HEIMANN
23                                             & BERNSTEIN, LLP
                                           One Nashville Place
24                                         150 Fourth Avenue, North, Ste. 1650
                                           Telephone:  (615) 313-9000
25                                         Facsimile:   (615) 313-9965

26

27

28

1

Kim D. Stephens
TOUSLEY BRAIN STEPHENS PLLC

2

1700 Seventh Avenue, Ste. 2200

3

Seattle, WA  98101-4416
Telephone:  (206) 682-5600

4

Facsimile:   (206) 682-2992

5

Michael McShane

6

AUDET & PARTNERS, LLP
221 Main Street, Ste. 1460

7

San Francisco, CA  94105
Telephone:  (415) 568-2555

8

Facsimile:   (415) 568-2556

9

Robert D. Gray (*pro hac vice*)
Jori Bloom Naegele (*pro hac vice*)

10

GARY, NAEGELE & THEADO, LLC

11

446 Broadway Avenue
Lorain, OH  44052

12

Telephone:  (440) 244-4809
Facsimile:   (440) 244-3462

13

14

Richard S. Lewis (*pro hac vice*)
James J. Pizzirusso (*pro hac vice*)

15

HAUSFELD LLP
1700 K Street, NW, Ste. 650

16

Washington, DC  20006
Telephone:  (202) 540-7200

17

Facsimile:   (202) 540-7201

18

Robert K. Shelquist

19

LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Ste. 200

20

Minneapolis, MN  55401-2197
Telephone:  (612) 339-6900

21

Facsimile:   (612) 339-0981

22

Charles L. LaDuca

23

CUNEO, GILBERT & LADUCA, LLP
507 C Street, NE

24

Washington, DC  20002
Telephone:  (202) 789-3960

25

Facsimile:   (202) 789-1813

26

*Counsel for Dean Mahan, Steven McKenna, John*

27

*Forcella, Sabrina W. Hass and Dr. Lanny W. Hass,*
*Amy Biondi-Huffman, and Brian Hathaway*

28